Jean "Dee" HAWKS, Appellant,

v.

STATE of Alaska, DEPARTMENT OF PUBLIC SAFETY, Appellee.

No. S–6748.

Supreme Court of Alaska.

Dec. 29, 1995.

Joe P. Josephson, Anchorage, for Appellant.

Raymond M. Funk, Assistant Attorney General, Fairbanks, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

COMPTON, Justice.

## I. INTRODUCTION

This appeal arises from an action brought against the State by a mother for a five-year delay in the identification of her daughter's remains. The superior court granted summary judgment to the State. We affirm.

## II. FACTS AND PROCEEDINGS

Jean "Dee" Hawks (Hawks) is the mother of Delynn R. Frey (Frey). Sometime during July 1983 Hawks reported to the Anchorage Police Department (APD) that Frey was missing. In the fall of 1983, two detectives interviewed Hawks and her husband at their home in Fairbanks. The Hawks told the detectives that Frey had broken her arm some years before, and that when she disappeared she might have been wearing some jewelry Hawks could identify. Other investigation notes indicate that APD was aware that Frey was a heroin addict.

In May 1984 the Alaska State Troopers (AST) located some articles of female clothing, a knife, a hypodermic needle, a syringe, a metal spoon, and other items at a site on the Knik River. The site had been identified by Robert Hansen, a serial killer who preyed upon Anchorage women in the early 1980's, as one of his burial sites.

In response to an August 1984 inquiry from Trooper Wayne Von Clasen, Hawks reported that the medical records of Frey's arm fracture could be obtained from Las Cruces Memorial Hospital in New Mexico. Trooper Von Clasen sought to obtain these records, and other records related to dental work Frey was said to have undergone, but was unsuccessful.

In August 1985 Mr. C.C. "Buck" Kuhn discovered human remains on a Knik River sandbar not far from the location where AST

previously had found the clothing and other items. AST recovered two rings with these remains. A forensic pathologist conducted an autopsy of the remains, but was unable to make an identification due to their extensive decomposition. Trooper Von Clasen was not involved in the recovery or attempted identification of the remains.

Between 1984 and 1989 Hawks repeatedly contacted APD about Frey. In March 1989 Trooper Selden took over the case and contacted Hawks, who had since moved to Hawaii. In May 1989 Selden obtained Frey's medical records from New Mexico. He then had the remains exhumed and a second autopsy performed. The pathologist confirmed that a fracture appearing in the right arm bone was consistent with Frey's healed fracture. Selden sent the rings originally found with the body to Hawaii for the Hawks' inspection. Mr. Hawks identified one of the rings as belonging to Frey.

In November 1989 the case was transferred to Trooper DeHart. Later that month, he requested an anthropological examination of the remains to "confirm that they are consistent with Frey's height, weight, and race." The examination, performed in January, 1990, determined that the remains were consistent with the description of Frey. In February 1990 DeHart informed Hawks that the remains had been identified as those of her daughter.

Hawks sued the State for intentional and negligent infliction of emotional distress. The gravamen of her claims is that if the police had been more diligent in pursuing Frey's medical records and Hawks' identification of the rings, and had more carefully scrutinized the information available about Frey, the clothing site, and the remains, they could have more quickly identified the remains as Frey's. The State moved for summary judgment. The superior court granted summary judgment for the State as to all Hawks' claims. The superior court concluded: (1) Hawks had alleged no facts to support a claim of intentional, reckless, wanton, or grossly negligent behavior; (2) Hawks had failed to make out a *prima facie* case of negligent infliction of emotional distress (NIED); and (3) the State is statutorily im-mune from all Hawks' tort claims. The superior court denied Hawks' motion for reconsideration. Hawks took a timely appeal.

## III. DISCUSSION

### A. Standard of Review

■ This court reviews a superior court's grant of summary judgment *de novo. See Tongass Sport Fishing Ass'n v. State,* 866 P.2d 1314, 1317 n. 7 (Alaska 1994). In reviewing a grant of summary judgment we must determine if any genuine issue of material fact exists and if the moving party was entitled to judgment as a matter of law. *Moore v. State,* 553 P.2d 8, 15 (Alaska 1976). In determining if there is a genuine issue of material fact we must view the facts in the light most favorable to the non-moving party. *Beck v. Haines Terminal & Highway Co.,* 843 P.2d 1229, 1230 (Alaska 1992). The question whether Hawks presented sufficient evidence to support a *prima facie* case for intentional infliction of emotional distress is a threshold question to which we apply an abuse of discretion standard. *Cameron v. Beard,* 864 P.2d 538, 548 (Alaska 1993).

### B. Intentional Infliction of Emotional Distress (IIED)

■ In *Beard v. Baum,* 796 P.2d 1344, 1350 (Alaska 1990), this court reaffirmed its adoption of the elements of IIED set out in The Restatement (Second) of Torts. To make out a claim for IIED, the "offending party, through extreme or outrageous conduct, must intentionally or recklessly cause severe emotional distress or bodily harm to another." *Richardson v. Fairbanks N. Star Borough,* 705 P.2d 454, 456 (Alaska 1985); *Restatement (Second) of Torts* § 46(1) (1986). In considering an IIED claim the trial court must make a threshold determination "'whether [1] the severity of emotional distress and [2] the conduct of the offending party warrant a claim of intentional infliction of emotional distress.'" *Beard,* 796 P.2d at 1350 (quoting *Richardson,* 705 P.2d at 456). To sustain a claim for IIED, the actor's conduct must rise to the level of conduct which would warrant a punitive damages award. *Richardson,* 705 P.2d at 456. Thus,

"[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Oaksmith v. Brusich,* 774 P.2d 191, 200 (Alaska 1989), *quoted in Beard,* 796 P.2d at 1350.

Hawks argues that she presented sufficient evidence to meet her burden of proof on all elements of an IIED claim. She alternatively contends that, under this court's reasoning in *Beard,* the superior court erred in not holding an evidentiary hearing in which she could have presented evidence regarding the severity of her emotional distress and the outrageousness of the State's conduct.

■ We assume for the sake of analysis that the potential for emotional distress to a mother resulting from the disappearance and delayed identification of the remains of her young daughter cannot be seriously disputed. The superior court made no findings on this issue and the State does not reargue it in its brief. Emotional distress, however, is only one-half of the IIED equation. On our reading of the record, the State's conduct of the investigation exhibited, at most, a lack of diligence and organization that perhaps could be characterized as negligent; there is nothing "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *See Beard,* 796 P.2d at 1350. As for Hawks' claim that the trial court erred in not holding an evidentiary hearing, in *Beard* we remanded so the trial court could evaluate the evidence because the plaintiff there had made the necessary threshold showing on the conduct element of an IIED claim. *Id.* Because Hawks has made no such threshold showing in this case, her claim of error on the basis of a lack of an evidentiary hearing is unfounded. Accordingly, we hold that the superior court did not abuse its discretion in granting summary judgment on Hawks' IIED claim.

C. *Negligent Infliction of Emotional Distress (NIED)*

■ The first step in determining whether a negligence action can be maintained is to determine whether the defendant owed the plaintiff a duty of care under the circumstances. *Stephens v. State, Dept. of Revenue,* 746 P.2d 908, 910 (Alaska 1987). The concept of duty is not a legal talisman on which the court lays hands to decide novel questions, "but only an expression of the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection." Prosser, *Law of Torts* (4th ed. 1971), *quoted in Division of Corrections v. Neakok,* 721 P.2d 1121, 1125 (Alaska 1986). In *D.S.W. v. Fairbanks N. Star Borough Sch. Dist.,* 628 P.2d 554, 555 (Alaska 1981), this court adopted a list of considerations to aid in deciding when, as a matter of policy, a particular plaintiff is entitled to protection. These considerations include the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered an injury, the closeness of the connection between the defendant's conduct and the plaintiff's injury, the moral blame attached to the defendant's conduct, the policy of preventing further harm, the extent of the burden to the defendant and consequences to the community of imposing a duty of care, and the availability, cost and prevalence of insurance for the risk involved. *Id.*

■ Two of these factors, the foreseeability of harm to the plaintiff and the degree of certainty that the plaintiff suffered injury, weigh in favor of imposing a duty of care on the State. It is foreseeable that when potentially identifiable human remains are not identified, relatives of missing persons will be left to wonder about their beloved's fate. We assume that such lingering uncertainty could cause some psychic injury. Nevertheless, the majority of the *D.S.W.* factors militate against holding the State liable.

Hawks' injury is most closely connected to Hansen's depraved conduct, not the State's handling of the investigation. It was his choice of location and method of disposing of his victims' bodies that most directly caused the delay in the identification of Frey's remains. Moreover, there is little, if any, moral blame to attach to the investigating authorities' possible failure to correlate every known characteristic of every open missing

person case with every John Doe or Jane Doe deceased. *See Stephens,* 746 P.2d at 911.

Finally, "the consequences to the community" of imposing liability for a negligently-conducted investigation or identification are considerable. Identification of remains is one of many responsibilities of the State's law enforcement authorities; invariably, as with other types of investigations, some attempts at identification are successful and others are not. A decision by this court that imposed a duty of care on the police would open the judicial floodgates to allow review of all identifications and permit liability in those determined with twenty-twenty hindsight to have been negligently conducted. Such a decision would invariably lead to the diversion of resources from other projects and investigations. Decisions regarding the allocation of limited resources are better left to the executive branch. *See, e.g., Wainscott v. State,* 642 P.2d 1355, 1356 (Alaska 1982) ("[C]ourts are ill-equipped to investigate and balance the numerous factors that go into an executive or legislative decision.").

For the foregoing reasons, we conclude it is the more sound policy not to impose liability on the State for negligence in the attempted identification of remains. Therefore, we hold that the State owed no duty of care to Hawks.

Because we have concluded that Hawks' claims are without legal merit, we do not address the issue whether the State is immune from liability. *See Stephens,* 746 P.2d at 910 ("Before we determine whether a statutory immunity applies to a given case, we will determine whether the State would be liable to the plaintiff in the absence of the immunity.").

The decision of the superior court is AFFIRMED.