KAREN L., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, DIVISION OF FAMILY AND YOUTH SERVICES, Deborah Wing, Faye Moore, Patricia Chambers Mitchell, Rita Hutchens, And Ray Johnson of Division of Family And Youth Services, The Office of Public Advocacy, Barbara Malchick And Shirley Perry of The Office Of Public Advocacy, Langdon Psychiatric Corp., Greg McCarthy, M.D., And Michael Rose, Ph.D., Appellees.

No. S–7528.

Supreme Court of Alaska.

Feb. 6, 1998.

Karen L., pro se, Anchorage.

Raymond M. Funk, Assistant Attorney General, Fairbanks, and Bruce M. Botelho, Attorney General, Juneau, for Appellees State of Alaska, Department of Health and Social Services, Division of Family and Youth Services, Deborah Wing, Faye Moore, Patricia Chambers Mitchell, Rita Hutchens and Ray Johnson of Division of Family and Youth Services, the Office of Public Advocacy, Barbara Malchick and Shirley Perry of the Office of Public Advocacy.

R. Collin Middleton and Gregory A. Johnson, Middleton & Timme, Anchorage, for Appellee.

Greg McCarthy, M.D. David D. Floerchinger and Harland H. McElhany, DeLisio

Moran Geraghty & Zobel, Anchorage, for Appellee Michael Rose, Ph.D.

Before MATTHEWS, C.J., and EASTAUGH and BRYNER, JJ.

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

Karen L. sued mental health consultants and State agencies and employees, claiming their involvement in Child in Need of Aid (CINA) proceedings involving her son caused her to suffer emotional distress. The superior court granted summary judgment to the defendants, holding that the State defendants owed Karen no duty of care and that quasi-judicial immunity protected the mental health consultants. Because we agree, we affirm.

### II. FACTS AND PROCEEDINGS

The Division of Family and Youth Services (DFYS) took emergency custody of C.L., Karen's eleven-year-old son, after he ran away from home in August 1992 and reported his mother for abuse.[1] The superior court found that there was probable cause to believe that C.L. was a CINA and committed him to DFYS's temporary custody.

During the temporary custody hearing, C.L. testified that he wished to be placed with his eighteen-year-old sister, K.L. Karen adamantly opposed the placement, alleging that K.L. used drugs and was engaged in an incestuous relationship with C.L. Karen agreed to temporary placement in the Daniels' foster home.

DFYS placed C.L. at the Daniels' foster home, but he promptly ran away and told DFYS he would stay only with K.L. After completing a home study, DFYS gave K.L. a three-month provisional foster care license and placed C.L. with K.L. Karen continued to object to placing her son in K.L.'s home. She asserted, among other things, that there were unsuitable or dangerous persons in

---

**1.** C.L. told police that his mother had handcuffed him to a bed for two weeks, forced him to ingest numerous pills, and given him forced enemas six days a week since he was nine. A DFYS investigation tended to corroborate the facts as reported by C.L.

K.L.'s home. The CINA court found that it was in C.L.'s best interest to continue living with K.L. C.L. remained in K.L.'s custody.

C.L. was experiencing problems at school in early 1993 and K.L. was having trouble handling him. C.L. returned to his mother's home in March 1993 with DFYS's permission. DFYS and Karen agreed in May that legal and physical custody of C.L. would be returned to Karen. The CINA court approved the agreement in July 1993 and dismissed the CINA case in October.

■ Karen filed suit in the superior court in 1994 against the State defendants.[2] Although she alleged a variety of claims,[3] in essence she claimed that the State defendants acted negligently or wrongfully in the CINA case, and caused psychological and emotional injury to her and C.L.[4] Karen filed a separate lawsuit against Dr. Greg McCarthy, Langdon Psychiatric Corporation (Dr. McCarthy's employer), and Dr. Michael Rose, alleging negligence, medical malpractice, and breach of fiduciary duty in their evaluations of Karen, C.L., and K.L.[5] The two actions were consolidated.

The superior court, Judge Peter A. Michalski presiding, granted summary judgment to all defendants and dismissed Karen's claims. Karen appeals.

## III. DISCUSSION

### A. Standard of Review

■ We review a grant of summary judgment *de novo*. *Nielson v. Benton*, 903 P.2d 1049, 1052 (Alaska 1995). We "will uphold a summary judgment only if the record presents no genuine issues of material fact and 'the moving party was entitled to judgment on the law applicable to the established facts.'" *Newton v. Magill*, 872 P.2d 1213, 1215 (Alaska 1994) (citation omitted); Alaska R. Civ. P. 56(c). "The proffered evidence is to be viewed in the light most favorable to the party opposing the motion." *Husky Oil N.P.R. Operations, Inc. v. Sea Airmotive, Inc.*, 724 P.2d 531, 533 (Alaska 1986) (citation omitted). The non-moving party is entitled to have all reasonable inferences of fact drawn in its favor. *Newton*, 872 P.2d at 1215 (citation omitted).

2. Karen sued the State, the Department of Health and Social Services (DHSS), DFYS, DFYS social workers Deborah Wing, Faye Moore, Patricia Chambers Mitchell, Rita Hutchens, and Ray Johnson, the Office of Public Advocacy (OPA), and guardians ad litem Barbara Malchick and Shirley Perry (GALs). We will refer to all these defendants as "the State defendants" except where context requires specificity.

3. Eight of the eighteen claims Karen asserted against the State defendants sought relief for Karen herself. Some of those claims (Second, Eighth, Tenth, Seventeenth) asserted that the State defendants had breached duties imposed by statute, regulation, or agency procedure. Some (Fourth, Thirteenth, Fifteenth) asserted that the foster care placement with K.L. was inappropriate and was not adequately supervised. Some (Second, Seventeenth) asserted that the State defendants failed to investigate the K.L. home adequately and should have realized that it was very unsuitable. Some (Tenth, Seventeenth) asserted that the State defendants breached the DFYS service plan founded on a September 2, 1992, "contractual agreement" under which Karen temporarily relinquished custody of C.L. to DFYS with the alleged expectation that C.L. would be placed in only a "proper" foster home and not K.L.'s home. One (Third) asserted that DFYS failed to give pertinent information to the doctors evaluating C.L. and K.L. Some (Thir-

teenth, Fifteenth) asserted that the State defendants should have realized the doctors' evaluations were based on incomplete information. One (Eighth) asserted that defendants failed to properly investigate the original complaint that Karen had abused C.L. even after C.L. and K.L. admitted that they had fabricated their original complaint. Some (Tenth, Seventeenth) asserted that statutory and common law duties arose out of contractual or fiduciary relationships.

4. The superior court dismissed the claims Karen asserted on C.L.'s behalf. The superior court concluded that a minor child cannot bring suit through a parent who, as here, is not represented by an attorney. *See, e.g., Osei–Afriyie v. Medical College of Pa.*, 937 F.2d 876, 882–83 (3d Cir. 1991); *Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir.1990). Although Karen appealed the dismissal of C.L.'s claims, she only mentions the issue in her brief and has not substantively briefed it. We therefore deem the issue waived. *Petersen v. Mutual Life Ins. Co.*, 803 P.2d 406, 411 (Alaska 1990). Although Karen is pro se on appeal, her appellate briefs are well crafted.

5. We refer to Michael Rose, Ph.D., Greg McCarthy, M.D., and the Langdon Psychiatric Corp., collectively as "the mental health consultants" or "the doctors."

B. *Did the Superior Court Err in Granting Summary Judgment to the State Defendants?*

1. *Did the social worker defendants owe Karen a duty of care?*

The superior court ruled that the State defendants were immune from suit. After Karen moved for reconsideration, the court also concluded, applying the so-called *D.S.W.* duty factors, that the State defendants owed Karen no duty of care, and granted complete summary judgment to the State defendants.[6] Karen argues that the superior court erred in analyzing those factors.

Karen's claims did not allege that the State defendants caused her to suffer physical injury or abuse. They alleged instead that she had suffered psychological and emotional injury or emotional distress because (1) she and C.L. were subjected to risk of harm from abuse; (2) C.L. was given inadequate treatment; (3) she lost filial consortium with her son; or (4) she suffered a loss of employment.[7] She now argues that her emotional distress was inflicted both intentionally and negligently.

Underlying Karen's various negligence claims against the "social worker defendants" (the State, DHSS, DFYS, and their officers and employees, but not OPA and the individual GALs) is the notion that the State and its employees owed her, as mother of C.L., an actionable duty of care to protect her from emotional distress as a result of C.L.'s CINA proceedings. Karen asserts on appeal that DFYS breached duties it owed her personally when it negligently investigated K.L.'s suitability as a foster parent for C.L., negligently placed C.L. with K.L., negligently licensed K.L. as a temporary foster parent for C.L., and negligently failed to monitor the placement. She claims that the social worker defendants negligently allowed C.L. to be exposed to dangerous and abusive adults living in or visiting K.L.'s homes.

The narrow question is whether the State defendants owed Karen a duty of care to protect her from emotional distress with respect to the CINA proceeding.[8] This requires us to determine "whether the defendant owed the plaintiff a duty of care under the circumstances." *Hawks v. State, Dep't of Pub. Safety*, 908 P.2d 1013, 1016 (Alaska 1995); *Stephens v. State, Dep't of Revenue*, 746 P.2d 908, 910 (Alaska 1987); *see also Chizmar v. Mackie*, 896 P.2d 196, 203 (Alaska 1995) (stating that "a plaintiff's right to recover emotional damages caused by mere negligence should be limited to those cases where the defendant owes the plaintiff a preexisting duty").

---

6. *See D.S.W. v. Fairbanks N. Star Borough Sch. Dist.*, 628 P.2d 554, 555 (Alaska 1981), where we adopted a multi-factor approach to determine whether, as a matter of public policy, an actionable duty of care existed. These factors include: "[t]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved." *Id.* at 555 (quoting *Peter W. v. San Francisco Unified Sch. Dist.*, 60 Cal.App.3d 814, 131 Cal. Rptr. 854, 859–60 (1976)). In *Estate of Day v. Willis*, 897 P.2d 78, 81 (Alaska 1995), we stated that "Whether a legal duty exists, when not governed by statute, is a public policy question involving specified considerations that this court enumerated in *D.S.W. . . . .*"

7. Karen also asserted the "Plaintiffs were harmed" by a harmful delay in delivery of "appropriate" medical and psychological care. She did not, however, plead that she was personally entitled to receive any such care. Her complaints do not clearly indicate whether her alleged loss of employment was itself a separate injury, or was part of her claim that she suffered emotional and psychological distress.

8. It is not necessary to consider whether any defendants owed C.L. an actionable duty because he is not a party to this appeal. *See also supra* note 4.

We need not reach the immunity issue unless we first decide that a defendant owes the plaintiff an actionable duty. We have stated that "[b]efore we determine whether a statutory immunity applies to a given case, we will determine whether the State would be liable to the plaintiff in the absence of the immunity." *Stephens v. State, Dep't of Revenue*, 746 P.2d 908, 910 (Alaska 1987) (citation omitted).

Because common law is the only potential source of any actionable duty owed by the social worker defendants to Karen,[9] we look to the *D.S.W.* factors to resolve the duty issue.

■ *Foreseeability of the harm.* The foreseeability of the harm suffered by the plaintiff is often regarded as the most important *D.S.W.* factor. *R.E. v. State*, 878 P.2d 1341, 1346 (Alaska 1994); *Division of Corrections v. Neakok*, 721 P.2d 1121, 1125 (Alaska 1986). We must therefore decide whether it was foreseeable that Karen would suffer actionable emotional distress because of the CINA proceeding.

In another context we have required " 'reasonable foreseeability that the plaintiff-witness would suffer emotional harm.' " *Beck v. State, Dep't of Transp. & Pub. Facilities*, 837 P.2d 105, 109 (Alaska 1992) (quoting *Tommy's Elbow Room, Inc. v. Kavorkian*, 727 P.2d 1038, 1043 (Alaska 1986)). In *Beck* we considered whether it was error to grant summary judgment dismissing a parent's negligent infliction of emotional distress (NIED) claim after she saw her seriously injured daughter enter the hospital on a gurney following an accident. We noted that the facts were "intermediate" between two prior cases, *Mattingly v. Sheldon Jackson College*, 743 P.2d 356 (Alaska 1987), and *Tommy's Elbow Room, Inc. v. Kavorkian*, 727 P.2d 1038 (Alaska 1986). In distinguishing those two cases in *Beck*, we noted that the father in *Kavorkian* was permitted to assert an NIED claim after rushing to the scene of his daughter's fatal automobile accident and watching rescuers remove her from the wreckage. *See Kavorkian*, 727 P.2d at 1040–43. In comparison, we observed that the *Mattingly* plaintiff was in Ketchikan when he learned of an accident that had occurred in Sitka. We found it significant that the plaintiff was a considerable distance

from the accident scene, that the shock of observing the injured victims did not follow closely on the heels of the accident, and that he had time to "steel himself" during the 150–mile flight to Sitka. *Mattingly*, 743 P.2d at 365–66. In *Beck*, the mother experienced shock as the result of a sudden sensory observation of her daughter's traumatic injuries during the "continuous flow of events in the immediate aftermath of the accident." It could not be said she had time to "steel herself." *Beck*, 837 P.2d at 110–11. We consequently held that it was error to dismiss Beck's NIED claim. In so ruling, we recognized that

> [O]ne who is thrust, either voluntarily or involuntarily, into such dramatic events and who makes a sudden sensory observation of the traumatic injuries of a close relative in the immediate aftermath of the event which produced them is no less entitled to assert a claim for his or her emotional injuries than one who actually witnessed the event. By contrast, one who learns of the injury or death of a loved one, or who observes the pain and suffering or the injuries only after a considerable period of time has elapsed since the accident, suffers a harm which, while foreseeable, policy and reason dictate the law should not regard as compensable.

*Id.* at 110–11.

That observation is equally pertinent here. That a parent may foreseeably suffer some distress as a result of concerns about the placement and treatment of her child is not alone sufficient to establish the existence of a duty. The foreseeability we require is not present just because it is foreseeable that most parents will suffer some distress whenever their children's well-being is at risk. We require " 'that the shock result more or less contemporaneously with the plaintiff's

9. Other typical theoretical sources of actionable duties are statutes, regulations, certain contracts, express undertakings, or fiduciary relationships. Those possible sources do not apply here. No statute or regulation imposed or implied a duty of care in favor of Karen; no contract between Karen and these defendants imposed a duty to refrain from conduct that would foreseeably result in emotional harm to Karen, *see infra*, note 13; these defendants entered into no fiduciary

relationship with Karen; and these defendants did not expressly undertake to protect Karen from emotional distress. If one of those duty sources applied, it would not be necessary to consider the *D.S.W.* factors. *See Waskey v. Municipality of Anchorage*, 909 P.2d 342, 343–44 (Alaska 1996) (finding it "unnecessary to resort to the *D.S.W.* approach" where we had decided other cases "more closely related" to the subject duty dispute).

learning of the nature of the victim's injury.'" *Id.* at 109 (quoting *Mattingly,* 743 P.2d at 365–66).

Certainly the extent of trauma suffered by the child bears on the foreseeability of the harm suffered by the plaintiff. We note that C.L. did not suffer serious physical injury or death, as did the plaintiffs' children in *Hawks* and *Beck.* At worst, C.L. was allegedly exposed to unsafe or abusive living conditions and did not receive treatment. He was not alleged to have suffered the sort of sudden and grave trauma that would generate acute shock, nor did Karen allege that she suffered a revelatory contemporaneous observation of C.L. in an injured condition. We think that it is not reasonably foreseeable that the conduct of the social workers and the consequences to C.L. would cause Karen to suffer the sort of actionable emotional harm that foreseeably results when a parent observes a gravely injured child soon after an accident.

Moreover, it is to be expected that any litigation, and certainly a CINA proceeding in which the child is taken from its parent following allegations of abuse, will cause the parent some distress. That does not mean that the distress should be actionable. The simple foreseeability that a parent will suffer distress proves too much. It is foreseeable that the parent of a child severely injured in an automobile accident may come upon the scene of the accident and observe the child's traumatic injuries in the immediate aftermath of the accident. It is not nearly so foreseeable that a parent who is a participant in judicial proceedings in which the parent's suitability is at issue will be unable to "steel herself" over concerns for her child and the course of the proceedings. Given that a parent in such a situation has a right to counsel, Alaska Child in Need of Aid Rule 12, it is also foreseeable that the parent will have a fair opportunity to participate in the CINA proceedings and urge return of the child or placement with another custodian, thus avoiding or minimizing the parent's distress.

It is not self-evident that the sort of harm which a parent may suffer during a CINA proceeding is one the law regards as compensable. *Cf. Beck,* 837 P.2d at 109–11.

*Other factors.* The other *D.S.W.* factors weigh against imposing a duty here. A recent case involving emotional distress claims against the State is illustrative. In *Hawks v. State, Department of Public Safety,* 908 P.2d 1013 (Alaska 1995), Hawks alleged that the State negligently delayed identification of the remains of her daughter. Hawks sued for intentional and negligent infliction of emotional distress. *Id.* at 1015. The superior court granted summary judgment to the State. *Id.* In affirming, we noted that even though two *D.S.W.* factors, foreseeability of harm and degree of certainty the plaintiff suffered injury, weighed in favor of imposing a duty, the remaining factors militated against holding the State liable. *Id.* at 1016. We noted that Hawks's injury was most closely connected to the depraved conduct of the man who murdered Hawks's daughter, and that there was little moral blame to attach to the investigating authorities' possible failure to correlate every known characteristic of every known missing person with every John Doe or Jane Doe decedent. *Id.* at 1016–17. We also noted that the consequences of imposing liability would be considerable and would invariably lead to the diversion of resources from other projects and investigations. *Id.* at 1017. We consequently affirmed dismissal of the NIED claim.[10]

These criteria militate against imposing a duty of care on the social worker defendants. It is not obvious that any distress suffered by Karen was caused by the conduct of the social workers, nor is it at all certain what injury Karen actually suffered. An emotional distress claim is necessarily amorphous, in both its origins and its effects. C.L. ran away from Karen's home as a result of her conduct. *See supra* note 1. It was that conduct that led to the commencement of the CINA proceeding. When C.L. ran from the

---

**10.** We also affirmed dismissal of the intentional infliction of emotional distress (IIED) claim because Hawks had made no threshold showing of the outrageous and extreme conduct essential to an IIED claim. *Hawks v. State, Dep't of Pub. Safety,* 908 P.2d 1013, 1016 (Alaska 1995). Kar-

en did not make the necessary threshold showing on the conduct element for an IIED claim, and the record requires the conclusion that the conduct of the social worker defendants was neither outrageous nor extreme. The superior court properly dismissed Karen's IIED claim.

original foster home placement and expressed a preference for placement with K.L.'s, he was placed in K.L.'s home. The CINA court issued the custody order and later declined to find an abuse of discretion in the placement on review. Attempting to determine the sources of Karen's distress would be difficult; attributing any part to the social workers' conduct would be problematic.

It also appears that no moral blame attaches to the conduct of the social workers in following state policy regarding foster care placement with a relative, notwithstanding Karen's objections. A social worker and the GAL both investigated Karen's placement complaints and found them to be unsubstantiated. The State later obtained a psychological evaluation of the foster mother, as well as the parties, and found no basis to remove C.L.

The *D.S.W.* factors concerning the policy of prevention of future harm, the extent of the burden on the defendant, and the consequences to the community of imposing liability can easily be considered together. We agree with the superior court's observation that

> allowing aggrieved parents to sue the State for actions or inactions during the course of a CINA investigation or proceeding would greatly burden society's already scarce social worker resources. Social workers should be helping children in need of aid. They should not be spending their time in burdensome collateral litigation.

The superior court also concluded that imposing liability "would have a chilling effect on the actions of social workers." The court noted that the best interests of the child should guide social workers, and they "should not have their decision making colored by the specter of collateral litigation." We agree.

It does not appear that the policy of preventing future harm would be advanced by imposing a duty here, because it is not obvious that Karen's distress would have been avoided by anything less than immediate dismissal of the CINA proceeding and return of C.L. Moreover, CINA proceedings already incorporate substantial protections for parents and children. Karen had the assistance of capable and vigorous advocacy, and C.L. had a GAL.

The causal connection between the social worker defendants' conduct and Karen's alleged injury is remote. *See D.S.W.,* 628 P.2d at 555. The removal of C.L. from Karen's custody into State custody was the result of a court order, based on a finding of probable cause that Karen had abused C.L. Karen never challenged this order. Although DFYS investigated and licensed K.L. as a temporary foster parent, the final placement decision was the product of an adversarial CINA proceeding in which the superior court had an opportunity to hear the views of all interested persons and agencies. Thus, at the September 2, 1992, CINA hearing conducted by Master Lucinda J. McBurney, Karen agreed that C.L. could be placed in a foster home so long as it was not K.L.'s home, and C.L. insisted that he wanted to stay at his sister's. The master found that "at this point the relative [K.L.] placement is not in his best interests...." C.L. then ran away from the Daniels' foster home. C.L. was thereafter placed with his sister, K.L. The custody decision was reviewed at an October 5 hearing at which Karen was represented by counsel. DFYS acknowledged the mother's objections to the placement, but stated that "the sister's home was ... an appropriate place for him." DFYS and the GAL indicated that it was also probably the only place where he would stay and not run away. Magistrate William D. Hitchcock stated an intention to enter an order finding that it was in C.L.'s best interests to continue the custody order and the placement with K.L.

Karen later moved for placement review, as she was entitled to do under CINA Rule 10(d)(2). The main issue then presented by Karen and her counsel in the CINA proceeding was whether C.L. should be placed at Charter North Hospital for a seventy-two-hour evaluation, as Karen requested. Karen also asserted that the continued placement with K.L. was undesirable, and that DFYS had not fulfilled its duty of engaging in permanency planning for reunification. After a two-day hearing, Magistrate Hitchcock denied Karen's request for a court-ordered in-

patient mental health evaluation of C.L. and implicitly approved of C.L.'s continuing placement with K.L. The CINA proceeding was the proper forum for addressing complaints about foster care placement and treatment. The CINA court's approval of the temporary placement decision further attenuates any connection between the social worker defendants' conduct and the injury.

The loss of consortium claim is governed by the *D.S.W.* factors discussed above.

■ Karen's alleged loss of employment cannot be the basis for an emotional distress claim (assuming that is what Karen's complaint attempted to plead). Considered independently, the loss of employment claim is also foreclosed by the *D.S.W.* factors. Such a harm is not foreseeable, and any causal connection is too remote.

The superior court did not err in dismissing Karen's claims against the social worker defendants for want of a duty of care.

### 2. *Did the GALs owe Karen a duty of care?*

■ Karen argues that the court-appointed GALs (OPA and individual GALs Malchick and Perry) owed duties to C.L., such as a duty to zealously represent C.L.'s interests as his legal counsel. *See* AS 25.24.310(c) (concerning appointment of a GAL and limiting GAL's authority to matters related to representation of child's best interests). She does not, however, establish that the GALs owed any duty to her. Nor does she demonstrate how a breach of any duty the GALs owed C.L. could give her any cause of action against the GALs. CINA Rule 11(a) states that the GAL represents the child's best interests, and CINA Rule 11(c) states that the GAL is a party. By implication, the duties a GAL owes the child do not extend to other parties, especially to parties whose interests may be adverse to those of the child. C.L. implicated Karen in abuse, resulting in commencement of the CINA proceedings, and expressed a preference for placement with K.L., contrary to Karen's own wishes. As the State notes, a GAL owes no duty of care to a parent who is an adverse party in the CINA litigation.

We conclude that the court did not err in granting summary judgment to OPA and the individual GALs. We consequently need not reach any issue of sovereign and official immunity.

### C. *Did the Superior Court Err in Granting Summary Judgment to the Doctors?*

In its preadjudication order issued after the October custody review hearing, the CINA court adopted DFYS's case plan. The case plan called for mental health evaluations of C.L., Karen, and K.L. The order stated that the case plan was in C.L.'s best interests, and recognized that it would evolve, noting that "full development of such a plan must await outcome of assessments."

Pursuant to the order, DFYS arranged for Drs. Rose and McCarthy to evaluate the family members. The CINA court relied heavily on these evaluations during the December hearing, when it found that an inpatient psychiatric evaluation of C.L. was unnecessary.

The superior court granted the doctors' motion for summary judgment, concluding that they were entitled to absolute quasi-judicial immunity because their evaluations were integral to the judicial process.

Karen argues that the superior court misapplied the doctrine of quasi-judicial immunity to shield the doctors. She contends that the doctrine only applies to services specifically ordered by the court.

■ The doctors correctly argue that our decision in *Lythgoe v. Guinn,* 884 P.2d 1085 (Alaska 1994), is controlling. We there held that a court-appointed psychologist was entitled to quasi-judicial immunity for claims arising out of her services as an independent custody investigator. *Id.* at 1088–89.

Although the psychologist in *Lythgoe* was court-appointed, it is irrelevant that Drs. McCarthy and Rose were initially selected by DFYS and subsequently approved by the court. We have recognized that it is not "'how the psychologist was first chosen but whether his activity is an integral part of the judicial process so that to deny immunity would disserve the broader public interest that non-judicial officers act without fear of

liability.'" *Lythgoe,* 884 P.2d at 1088 (quoting *Lavit v. Superior Court,* 173 Ariz. 96, 839 P.2d 1141, 1144 (Ariz.App.1992) (holding that psychologist initially chosen by the parties without court involvement was entitled to judicial immunity)).[11]

The superior court did not err in granting summary judgment to the doctors.

> D. *Did the Superior Court Abuse Its Discretion in Granting the GALs' and the Social Workers' Motions to Stay Discovery and in Denying Karen's Motion to Compel?*

Karen argues that the trial court erred in rendering three discovery rulings: (1) granting the GALs' motion to stay discovery pending resolution of their motion for summary judgment; (2) granting the individual social workers' motion to stay discovery pending resolution of their motion for summary judgment; and (3) denying Karen's motion to compel production. She contends that the stay "unjustly crippled [her] ability to oppose summary judgment."[12]

■ The State correctly argues that "[t]he purpose of official immunity is to shield government officials from the distractions of litigation arising from the performance of their official duties." Official immunity shelters government officials not just from liability, but from *suit,* including pre-trial discovery. *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985); *see also Martin v. D.C. Metro. Police Dep't,* 812 F.2d 1425, 1430 (D.C.Cir.1987) ("Discovery is itself one of the burdens from which defendants are sheltered by the immunity doctrine.") *overruled on other grounds, Crawford–El v. Britton,* 93 F.3d 813 (D.C.Cir. 1996). The superior court did not abuse its discretion in granting the motions to stay discovery as to the individual State defendants.

Karen's motion to compel sought production of (1) job descriptions for individual State employees; (2) personnel files for those employees; (3) the State Department of Law's investigatory files for C.L.'s CINA case; (4) certain Anchorage Police Department records; (5) Department of Law information about prior suits or claims against any of the State defendants; and (6) all DFYS manuals relating to CINA proceedings and foster care licensing. Karen has not demonstrated that, to the extent particular categories of documents might have been properly discoverable, the court abused its discretion in denying relief to Karen on the discovery issues, given the potentially dispositive legal issues looming in the case. Further, Karen has not demonstrated how any error on these issues potentially prejudiced her ability to oppose the defendants' summary judgment motions.

> E. *Was the State Defendants' Peremptory Challenge Timely?*

Karen contends that the State's peremptory challenge of Judge John Reese was untimely, because it was filed more than five days after the State was served with the summons showing that the case was assigned to him.

■ The summons was served on the State on September 16. On October 5 the State defendants filed their entry of appearance, answer, and peremptory challenge. The court accepted the peremptory challenge and reassigned the case to another judge on October 11. Karen's timeliness objections were denied.

Alaska Civil Rule 42(c)(3) provides in part:

> Where a party has been served or enters an action after the case has been assigned to a specific judge, a notice of a change of judge shall also be timely if filed by the

---

11. There is no evidence in the record to support Karen's alternative argument that the doctors were not entitled to quasi-judicial immunity because they "treated" C.L. The doctors provided evaluations and recommendations to assist the CINA court in determining the proper placement and counseling needs of C.L.; they themselves did not provide therapy.

Likewise, it is not material that Dr. McCarthy's services, which included an evaluation of K.L., arguably had a bearing on the decision to issue K.L. a foster home license. His services were intrinsic to the CINA proceeding, and he is entitled to quasi-judicial immunity with respect to those services.

12. We review discovery orders under an abuse of discretion standard. *R.E. v. State,* 878 P.2d 1341, 1345 (Alaska 1994).

**880**

party before the commencement of trial and within five days after a party appears or files a pleading in the action.

Because no trial had commenced and the challenge was filed on the same day the State defendants entered an appearance, the presiding judge properly rejected Karen's argument that the State's peremptory challenge was untimely.[13]

### IV. CONCLUSION

We AFFIRM

COMPTON, C.J., and FABE, J., not participating.

---

13. Karen also raises a series of constitutional arguments, and alleges procedural and substantive due process violations. Karen briefly mentioned, in only the most conclusory fashion, constitutional violations at several places in her 157-page superior court opposition to the State defendants' summary judgment motion. Because Karen did not substantively raise these arguments below, they are deemed waived. *Arnett v. Baskous*, 856 P.2d 790, 791 n. 1 (Alaska 1993). She has not demonstrated that these issues involve plain error, or that there is any other excuse for her failure to raise them adequately in the superior court. Further, there would appear to be no basis for finding a denial of procedural

due process, given the active involvement of the court in the CINA proceeding. A parent in a CINA proceeding has a right to counsel, CINA Rule 12, and Karen was forcefully represented during the CINA proceeding.

Karen also argues that the State "breached" a written "contract"—the case plan—between herself and the State. She provides no support for the contention that the case plan is an enforceable contract. The State counters that "there was never a written plan that was signed by the parties." In addition, the State may unilaterally modify its case plan as necessary. *Matter of A.B.*, 791 P.2d 615, 624 n. 14 (Alaska 1990). There is no merit to Karen's contract claim.