David **MESIAR**, in his official capacity, and State of Alaska, Department of Fish and Game, Petitioners,

v.

Art **HECKMAN**, Sr., Fred Lamont, Sr., and Martin Kelley, on behalf of themselves and all others similarly situated, Respondents.

No. S–7892.

Supreme Court of Alaska.

Sept. 11, 1998.

Gary M. Guarino and Venable Vermont, Jr., Assistant Attorneys General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Petitioners.

Russell L. Winner and Lisa H. Donnelley, Winner & Associates, P.C., Anchorage, and Myron Angstman, Angstman Law Office, Bethel, for Respondents.

Before MATTHEWS, C.J., and COMPTON, EASTAUGH, FABE and BRYNER, JJ.

*OPINION*

BRYNER, Justice.

## I. *INTRODUCTION*

Art Heckman, Fred Lamont, and Martin Kelley (collectively Heckman) engage in commercial or subsistence fishing on the Yukon River drainage; on behalf of themselves and similarly situated resource users, they sued David Mesiar and the Alaska Department of Fish and Game (collectively ADF & G) for negligent operation of a sonar fish counter that ADF & G relied on to make fisheries closure decisions for the Yukon River drainage during the 1994 fishing season. The main issues presented are whether ADF & G owes Heckman an actionable duty to use reasonable care in fisheries data collection and management, and, alternatively, whether ADF & G is immune from tort liability for negligent data collection. We conclude that ADF & G owes no actionable duty to Heckman and do not reach the immunity question.

## II. *FACTS AND PROCEEDINGS*

The Commissioner of ADF & G has the responsibility to "manage, protect, maintain, improve, and extend the fish, game, and aquatic plant resources of the state in the interest of the economy and general well-being of the state." AS 16.05.020(2). Title 16, Chapter 5 of the Alaska Statutes gives ADF & G broad powers to carry out its statutory responsibilities, including the power to summarily order emergency openings and closures of fishing periods; such orders have the force and effect of law. *See* AS 16.05.020(3); AS 16.05.060(a)-(c).

In 1994 the Board of Fisheries promulgated 5 AAC 01.249 as a guideline for managing the fall chum-salmon run from July 16 through December 31 in the Yukon River drainage. The regulation included provisions governing mandatory closures and setting time limits for different fisheries—commercial, sport, personal use, and subsistence—depending on the projected run size. 5 AAC 01.249.

In order to explain and supplement 5 AAC 01.249, ADF & G issued Regional Information Report No. 3A94–23, the "Yukon Area Commercial and Subsistence Salmon Fisheries 1994 Management Plan." In this plan, ADF & G stated that the sonar project near Pilot Station would be the primary method by which it would assess the fall chum salmon run. ADF & G set guidelines for operating the sonar and, in an internal memorandum entitled "Project Operational Plan for the Lower Yukon River Sonar," described these guidelines, as well as the sonar equipment itself and how it would be used in counting fish on the Yukon.

As a result of low salmon counts, ADF & G closed fisheries on the Yukon during parts of the 1994 fall chum season under 5 AAC 01.249. In response, Heckman filed a class

action against ADF & G employee David Mesiar and ADF & G, alleging that Mesiar, who operated the sonar counter near Pilot Station, negligently miscounted the run, thereby precipitating unnecessary closures and restrictions on Yukon River drainage chum fisheries.

ADF & G moved to dismiss Heckman's complaint for failure to state a claim, arguing primarily that it owed no actionable duty to Heckman and that, even if it did owe a duty, it had immunity from tort suits arising out of fisheries management decisions under AS 09.50.250(1)'s discretionary function exception. Superior Court Judge *pro tem* Mark Wood denied ADF & G's motion, holding that ADF & G owed Heckman a duty to operate sonar counting equipment in a non-negligent manner and that, though fisheries closure decisions themselves are immune discretionary functions, ministerial data collection functions supporting those decisions are not.

ADF & G petitioned this court to review Judge Wood's ruling. We granted the petition and now consider whether Heckman's cause of action for negligent fish counting can be sustained against ADF & G's assertions that it had no duty and is immune from liability. We begin by considering the issue of duty.

### III. *ADF & G OWES HECKMAN NO ACTIONABLE DUTY.*[1]

A. *The Relationship between ADF & G and Heckman Is the Same as the Relationship between ADF & G and Any Other Alaska Fisheries Resource User.*

■ The initial step in deciding whether an action for negligence can be maintained is to consider whether a duty exists. *See Kooly v. State,* 958 P.2d 1106, 1108 & n. 3 (Alaska 1998) (citing *Stephens v. State, Dep't of Revenue,* 746 P.2d 908, 910 (Alaska 1987)). Whether an actionable duty exists is a ques-

tion of law and public policy. *See Estate of Day v. Willis,* 897 P.2d 78, 80–81 (Alaska 1995). " 'Duty' is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." *City of Kotzebue v. McLean,* 702 P.2d 1309, 1313 (Alaska 1985) (quoting William L. Prosser, *The Law of Torts* § 53, at 325 (4th ed.1971)). In *McLean* we adopted an *ad hoc* approach to duty determinations, explaining that we "first define the class of cases to which our rulings will apply, then weigh the factors which support and oppose the imposition of liability in that class of cases." *Id.* at 1314.

■ In the first phase of duty analysis that *McLean* describes—defining the class of cases to which our ruling applies—we must bear in mind that duty is at heart a question of policy centering on the basic relationship between the parties rather than on the nature of their conduct on a given occasion. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 53, at 356 (5th ed.1984). Particular conduct becomes important only when a duty is imposed; the conduct then helps to determine the applicable standard of care: "It is better to reserve 'duty' for the problem of the *relation* between individuals which imposes upon one a legal obligation for the benefit of the other, and to deal with particular conduct in terms of a legal standard of what is required to meet [that] obligation." *Id.* (emphasis added). As we noted in *Kooly,* we must take "a generalized approach which asks whether a duty of care should be imposed in the general class of cases" exemplified by the case before the court. *Kooly,* 958 P.2d at 1109. This generalized approach is necessary because " 'fact-intensive inquiries pertain to the issues of breach, causation, and damages, not the threshold legal question of whether a duty exists.' " *Id.* (quoting *Bolieu v. Sisters of Providence in Washington,* 953 P.2d 1233, 1241 (Alaska 1998)).

---

1. Because Judge Wood considered materials outside the pleadings, we will review his decision as a denial of a summary judgment motion. *See Homeward Bound, Inc. v. Anchorage Sch. Dist.,* 791 P.2d 610, 612 (Alaska 1990). We therefore review the record *de novo* and, taking the facts in the light most favorable to the nonmoving party, determine whether any genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law. *See Hawks v. State, Dep't of Pub. Safety,* 908 P.2d 1013, 1015 (Alaska 1995).

The threshold issues, then, are what sort of relationship exists between the parties, and what class of cases does that relationship define. Heckman seems to argue that the parties' relationship is narrow and specific—that Mesiar was essentially counting salmon for the benefit of persons engaging in the Yukon River fall chum-salmon run. But ADF & G more broadly characterizes the relationship at issue here as the basic relationship between a resource manager and a resource user: "Fisheries management and population sampling are inexact processes and for every season and every fishery closure (or opening) there will be disappointed users." ADF & G contends that imposing "an actionable common law duty on a state to collect data for fisheries or public resource management in a non-negligent manner" would be virtually unprecedented. And it claims that recognizing such a broad duty "will encourage annual class-action suits to challenge unpopular ADF & G decisions."

■ In our view, ADF & G accurately characterizes the relationship at issue in this case and the class of cases it defines. Common-law principles and the common-use clause in article VIII, section 3, of the Alaska Constitution "impose upon the state a trust duty to manage the fish, wildlife and water resources of the state *for the benefit of all the people.*" Owsichek v. State, Guide Licensing & Control Bd., 763 P.2d 488, 495 (Alaska 1988) (emphasis added). Alaska Statutes 16.05.020(2) reflects this constitutional mandate: "The [ADF & G] commissioner shall ... manage ... the fish ... resources of the state in the interest of the economy and *general* well-being of the state[.]" AS 16.05.020(2) (emphasis added). Alaska Statutes 16.05.092 also mirrors the constitutional mandate, requiring ADF & G to "develop and continually maintain a comprehensive, coordinated state plan for the orderly present and long-range rehabilitation, enhancement, and development of all aspects of the state's fisheries *for the perpetual use, benefit, and enjoyment of all citizens.*" AS 16.05.092(1) (emphasis added).

ADF & G undoubtedly designed its sonar chum-salmon counting project to benefit Heckman and other Yukon River resource users. But Heckman and other Yukon River users were not the exclusive beneficiaries of the program. As part of ADF & G's overall resource-management effort, the sonar project served all resource users and potential users in Alaska. Heckman did stand to gain or lose from ADF & G's efforts more immediately and directly than other Alaskans. But this gave him no special power to demand a higher level of performance from the agency, and it gave him no vested right to recover damages in the event of ADF & G's failure.

In short, Heckman's relationship to ADF & G was that of a resource user to a resource manager. In performing his job as operator of the sonar fish counters, Mesiar collected data for ADF & G, not for Heckman.[2] And in making decisions based on Mesiar's data, ADF & G acted not for the particular and immediate benefit of Heckman and other users of the fall chum-salmon run then in progress, but for the broader benefit of short-term and long-term resource users statewide. If ADF & G owed Heckman an actionable duty of due care in counting fish during the fall chum run, logic would dictate that the agency owed the same duty to all resource users who might claim foreseeable injury as a result of ADF & G's failure to exercise due care in any ministerial aspect of any resource-management program.[3]

---

**2.** *See, e.g., Myers v. United States*, 17 F.3d 890, 900 (6th Cir.1994) (holding that government mine inspectors' duty ran only to government, not to miners); *Clemente v. United States*, 567 F.2d 1140, 1144–45 (1st Cir.1977) (holding that FAA inspectors' duty ran only to government, not to public).

**3.** In so observing, we do not suggest a revival of the "public duty doctrine," which we laid to rest in *Adams v. State*, 555 P.2d 235, 241–42 (Alaska 1976), and declined to resurrect in *City of Kotze-*

*bue v. McLean*, 702 P.2d 1309, 1311–12 (Alaska 1985). Our observation pertains not to ADF & G's abstract "public duty to all." *Adams*, 555 P.2d at 241. Rather, the point we make is that the specific actions at issue here—the decisions ADF & G based on Mesiar's data—simultaneously affected multiple and potentially conflicting classes of resource users. Proximity in time and place to an ADF & G resource-management action confers no automatic right of preference to one group of affected resource users over another. Accordingly, for purposes of defining "the

The relationship between resource manager and resource user, then, is "the class of cases to which our ruling[ ] will apply." *McLean*, 702 P.2d at 1314. We must now turn to the second phase of our duty analysis, which requires us to "weigh the factors which support and oppose the imposition of liability in [this] class." *Id.*

### B. *The State Owes No Duty to Heckman under the D.S.W. Duty Analysis.*

#### 1. *The D.S.W. factors*

In *D.S.W. v. Fairbanks North Star Borough School District*, 628 P.2d 554, 555 (Alaska 1981), we listed the following public policy considerations as relevant in determining if an actionable duty of care exists:

> The foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

*Id.* (quoting *Peter W. v. San Francisco Unified Sch. Dist.*, 60 Cal.App.3d 814, 131 Cal. Rptr. 854, 859–60 (1976)). Applying these factors to the present case, we conclude that no actionable duty should be found to exist.

#### a. *Foreseeability of harm, certainty of injury, and connection between conduct and injury*

In *Mattingly v. Sheldon Jackson College*, 743 P.2d 356, 361 (Alaska 1987), we held that, for purely economic harm, the identifiable class of plaintiffs must be particularly foreseeable in number, type, and economic expectations. ADF & G argues that the harm to Heckman is not foreseeable or certain because the class of plaintiffs is not particularized. Heckman counters that ADF & G

knew that its closure decisions would be based on the sonar numbers and that any inaccuracy could therefore result in harm to Heckman. In Heckman's view, the closures thus caused certain harm and were a direct result of the negligent sonar operation.

■ Both parties are correct. Heckman is correct in asserting that ADF & G's closure decisions predictably and specifically harmed users of the Yukon River drainage fall chum run. But ADF & G is also correct in observing that identifying plaintiffs and specific damages, as contemplated by *Mattingly*, 743 P.2d at 361, is problematic. ADF & G's resource-management decisions foreseeably affect many resource users other than those fishing the fall run upstream from the counters; the benefits to one class of users often will harm others, creating a potential conflict between classes of resource users alleging differing harms.

In any fisheries-regulation scheme, the interests of some classes of resource users at times become adverse to those of others; a management decision that benefits some inevitably will harm others. For instance, premature closures on the lower river allow more fish to reach upper-river users and may result in a larger escapement, providing future benefits to the ocean-fishing industry. The argument that Heckman's damages are foreseeable and certain thus proves too much: almost all fisheries-management decisions have predictable adverse effects on one class of resource users or another; because virtually any management action may be characterized as negligent, recognizing an actionable duty of due care to Heckman would foreseeably expose ADF & G to litigation for almost any future management decision. Hence, the foreseeability of harm to Heckman is not a dispositive factor. *Cf. Stephens*, 746 P.2d at 911–12 (imposing no duty of care in filing a lawsuit even though the State could foresee that a negligently brought suit would cause harm).

---

class of cases to which our ruling[ ] will apply," *McLean*, 702 P.2d at 1314, it is inconsequential that ADF & G's actions in the present case more immediately and directly affected the interests of

Yukon River users of the fall chum-salmon run than the interests of other potential salmon users.

### b. *Moral blame attached to ADF & G's conduct*

■ Virtually all negligence may be viewed as morally blameworthy. Yet in determining the existence of a duty, we have sometimes attached little moral blame to negligent conduct; at other times, we have emphasized this factor. ADF & G accurately observes that the differing treatment our case law accords to the blameworthiness of various negligent acts reflects distinctions in the types of risk they involve. Our cases have ascribed particular significance to the moral blameworthiness of negligence that creates a risk of death or serious personal injury; in contrast, we have ascribed little blameworthiness to ordinary negligence that merely causes economic or purely emotional harm.[4]

■ We certainly do not mean to trivialize the serious and substantial harm that ADF & G's alleged negligence may have caused Heckman and similarly situated resource users; but this harm is nonetheless primarily economic. We conclude that, when ordinary negligence creates a risk of economic harm only, moral blameworthiness is not a prominent factor for purposes of determining the existence of an actionable duty.

### c. *Policy of preventing future harm*

■ Heckman argues that future negligence in implementing sonar plans would be deterred by imposing a duty on ADF & G. We find the argument unpersuasive.

As we have already pointed out in our discussion of foreseeability, ADF & G's closure orders have different impacts on potentially conflicting groups of resource users. Recognizing an actionable duty to avoid negligent closures based on inaccurate sonar counts could impede ADF & G's ability to manage for all users by encouraging it to base closure decisions on the demands of a single user group. It is far from clear that an actionable duty of care would deter reliance on inaccurate data. To the contrary, the prospect of an action for damages might merely encourage ADF & G to succumb to the demands of the nearest and loudest group of resource users, regardless of the accuracy of ADF & G's data.

### d. *The extent of the burden to the defendant and consequences to the community of imposing a duty*

■ We find it likely that burdensome consequences would ensue if we declared actionable a public duty like the one ADF & G owes to all fish and wildlife resource users in Alaska. Allowing a cause of action against a state agency for negligent management decisions would open the door to endless damage claims by unlimited groups of resource users. Almost any management action might support a claim for damages. And in contemplating any proposed action, ADF & G might face competing threats of suit by processors and fishing vessel owners, by upstream and downstream residents, or by groups of resource users representing subsistence, commercial, and sport fishing interests.

It makes no difference that Heckman does not allege negligence arising from a management decision involving policy and discretion, but instead alleges a series of objectively verifiable flaws in implementing and monitoring ADF & G's sonar fish-counting project. ADF & G routinely bases its management decisions on data and information gathered from a wide array of sources. Holding the agency accountable in damages for mistakes in the information underlying its decisions would likely discourage it from acting on any but the clearest information. Yet hesitation prompted by fear of premature action might easily lead to cries of harm, and accompanying suits, from resource users whose interests lay in prompt and vigorous agency initiatives. Caught in the middle by competing threats of litigation in the event of either

---

4. *Compare, e.g., Hawks v. State, Dep't of Pub. Safety,* 908 P.2d 1013, 1016–17 (Alaska 1995) (imposing no duty of care in identifying remains), *and Stephens,* 746 P.2d at 911–12 (imposing no duty of care in bringing lawsuit), *with R.E. v. State,* 878 P.2d 1341, 1347 (Alaska 1994) (imposing duty of care in licencing day-care facility), *Division of Corrections v. Neakok,* 721 P.2d 1121, 1129 (Alaska 1986) (imposing duty of care in controlling parolee who later killed people), *and City of Kotzebue v. McLean,* 702 P.2d 1309, 1314 (Alaska 1985) (imposing duty of care in responding to identified caller who threatened to kill).

action or inaction, the agency ultimately might be driven by fear of litigation to heed the loudest threats, rather than to rely on sound principles of resource management.

In sum, once we recognized an actionable duty of care in gathering data, an alleged breach of the duty might provide an inroad for challenging broader, policy-based decisions. And the very awareness of this possibility might prompt ADF & G to alter its approach to making management decisions. The foreseeable negative consequences to the community would be that the state's resources would not be conserved for the benefit of all Alaskans, as article VIII, section 3 of the Alaska Constitution requires. Public policy dictates that ADF & G be free from such coercion in collecting data and making management decisions.

### e. *Availability of insurance*

█ The record contains no meaningful information concerning the availability or potential cost of insurance to protect the State from damages claims arising from negligent resource-management decisions. But given the unprecedented nature of a cause of action for damages stemming from negligent resource management, and given further that almost any management decision will harm some resource users and generate a risk of suit, we think it unlikely that the State could find or afford insurance. As a practical matter, it seems likely that the State would absorb all costs of litigation, in effect becoming a guarantor of Alaska's ability to ensure fish and wildlife resources to its citizens. This result hardly seems desirable.

### 2. *The D.S.W. factors do not warrant a finding of duty.*

█ Heckman cites no cases, and we are aware of none, holding that mere negligence by an agency charged with a general public duty of resource management supports a claim for damages by an affected resource

user. But there are significant similarities between the present case and *D.S.W.*, which involved the State's alleged negligence in fulfilling an analogous, broad-based public responsibility: providing public education to children. In *D.S.W.*, we declined to find an actionable right to a non-negligent education:

> Few of our institutions, if any, have aroused the controversies, or incurred the public dissatisfaction, which have attended the operation of the public schools.... To hold them to an actionable "duty of care," in the discharge of their academic functions, would expose them to the tort claims—real or imagined—of disaffected students and parents in countless numbers.

628 P.2d at 555–56 (quoting *Peter W. v. San Francisco Unified Sch. Dist.*, 60 Cal.App.3d 814, 131 Cal.Rptr. 854, 861 (1976)). As ADF & G correctly asserts, fisheries management, much like academic management, is an area fraught with controversy of the kind that invites litigation.[5] We would greatly compound the volatility surrounding fisheries issues by allowing a cause of action for negligent resource-management decisions. Holding ADF & G "to an actionable 'duty of care,' ... would expose [it] to the tort claims—real or imagined—of disaffected [resource users] in countless numbers." *Id.*

### IV. CONCLUSION

We conclude that the relationship between Heckman and ADF & G does not support an actionable duty.[6] Accordingly, we REVERSE the superior court's denial of ADF & G's motion to dismiss.

---

**5.** *See, e.g., Pullen v. Ulmer*, 923 P.2d 54 (Alaska 1996); *Stepovak–Shumagin Set Net Ass'n v. State, Bd. of Fisheries*, 886 P.2d 632 (Alaska 1994); *Gilbert v. State, Dep't of Fish & Game*, 803 P.2d 391 (Alaska 1990); *Meier v. State, Bd. of Fisheries*, 739 P.2d 172 (Alaska 1987).

**6.** Our decision that ADF & G owed Heckman no actionable duty of due care makes it unnecessary to consider the parties' immunity arguments. *See Hawks v. State, Dep't of Pub. Safety*, 908 P.2d 1013, 1017 (Alaska 1995).