LYNDEN INCORPORATED, Lynden Air Freight, Inc., Lynden Frontier Projects, Lynden Forwarding, Inc., Lynden Transport, Inc., Lynden Logistics, Inc., Appellants,

v.

James R. WALKER, Appellee.

No. S–9496.

Supreme Court of Alaska.

Sept. 14, 2001.

L.G. Berry, Robertson, Monagle & Eastaugh, Anchorage, for Appellant Lynden Logistics, Inc.

Timothy J. Petumenos, Birch, Horton, Bittner and Cherot, Anchorage, for Appellee.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

MATTHEWS, Justice.

### I. INTRODUCTION

Lynden Logistics appeals a judgment entered against it in a personal injury suit brought by James Walker. Lynden argues that the trial court erred in not granting Lynden summary judgment because it had no duty to Walker to load materials so that Walker could safely unload them and because there were no material facts at issue. Lynden also argues that the trial court erred in its jury instructions, abused its discretion in permitting one of Walker's expert witnesses to testify, erred in not granting JNOV on Walker's claim for future medical expenses, and erred in denying Lynden's motion for JNOV or a new trial.

Because Lynden had a duty to Walker to load the materials so that they could be safely unloaded, and there was a question of fact whether Lynden fulfilled its duty, we affirm the superior court's refusal to grant summary judgment or JNOV. We find that any confusion in individual instructions was harmless when considered in light of the instructions as a whole. We further find that the superior court did not abuse its discretion in permitting one of Walker's experts to testify. But because Walker failed to provide data on which the jury could reasonably rely in estimating future medical expenses, we vacate the award of future medical expenses and remand for remittitur.

### II. FACTS AND PROCEEDINGS

James Walker, an employee of H.C. Price Co., broke his ankle on February 19, 1993, while unloading pipe saddles from a truck at a construction site on the North Slope. The injury required eight surgeries on and fusion of his ankle, and led to several infections which required skin grafts. Walker will limp for the rest of his life.

Lynden Logistics, Inc., operated a warehouse facility owned by Arco. Lynden was responsible for managing the warehouse. When Arco contractors ordered construction material from the warehouse, Lynden employees staged and loaded the materials onto trucks supplied by the contractor. At the time of Walker's injury, his employer, H.C. Price, was building a pipeline for Arco.

On the date of the accident, Walker was sent to unload pipe saddles from a truck and to transport the saddles with a forklift to the construction site. Pipe saddles are U-shaped steel structures which weigh between 250 and 300 pounds. The truck Walker was instructed to unload carried six saddles banded to wooden pallets, and three loose saddles. It was a common practice at the warehouse for Lynden employees to load saddles without a pallet.

Walker unloaded the six saddles banded to pallets using his forklift. He attempted to unload the loose pipe saddles by hand with the help of the truck driver. Walker fell when they lost control of one of the pipe saddles, and shattered his ankle.

Walker sued Lynden, claiming that Lynden was negligent in failing to secure the

loose saddles to pallets, and that this failure caused the accident. Lynden moved for summary judgment, asserting that it did not have a duty to load the saddles in a way that would protect Walker from injury when he unloaded them and that "all the evidence shows the plaintiff's injuries were caused by his own neglect, not defendant's acts or omissions." The superior court denied Lynden's motion, holding that Lynden had a duty to Walker based on the Restatement (Second) of Torts §§ 391–393. The court found that there was a factual dispute as to whether Lynden's failure to bind the loose saddles to pallets was negligent.

At trial, some witnesses testified that loading loose pipe saddles onto trucks was a common practice. But other witnesses testified that loading loose saddles was dangerous and that prior to the accident, H.C. Price had requested that Lynden not load loose saddles. The jury also heard testimony that Walker could have safely unloaded the saddles using a forklift or other equipment.

Michael Burleson, testifying as an expert witness for Walker, stated that Lynden had failed to package the saddles properly, and that Lynden's failure to do so caused the accident. Lynden sought to preclude Burleson's testimony prior to trial, arguing that Burleson was not qualified as an expert witness. The superior court denied this motion.

At trial, the jury found that both Lynden and Walker were negligent, attributing seventy-five percent of the responsibility to Lynden and twenty-five percent to Walker. The jury found damages totaling $3,308,700, of which $200,000 were for future medical expenses. Lynden moved for JNOV or a new trial, alleging that the saddle could have been safely unloaded by Walker, and that the award of future medical expenses was not supported by the evidence. The court denied this motion and this appeal followed.

## III. STANDARD OF REVIEW

The denial of a motion for summary judgment is reviewed de novo.[1] A moving party is entitled to summary judgment if there are no material facts at issue and the movant is entitled to judgment as a matter of law.[2] All inferences of fact will be drawn in favor of the non-moving party.[3]

A challenge to jury instructions presents a question of law which is reviewed independently.[4] A legally erroneous instruction will lead to reversal only where it prejudices a party; prejudice exists unless one can "say with fair assurance that the result was not affected by [the] error."[5]

The decision to admit or exclude expert testimony is reviewed on appeal for abuse of discretion.[6] That standard also applies to appellate review of the denial of motions for a new trial.[7]

The denial of a motion for a directed verdict or JNOV will be affirmed unless "the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment as to the facts."[8]

## IV. DISCUSSION

A. *The Superior Court Properly Denied Lynden's Motion for Summary Judgment.*

1. *Lynden had a duty to load the pipe saddles in a manner that allowed them to be unloaded safely.*

In its motion for summary judgment, Lynden argued that it had no duty to Walker,

1. See *United Airlines, Inc. v. Good Taste, Inc.*, 982 P.2d 1259, 1262 (Alaska 1999).

2. See *id.*

3. See *id.*

4. See *Barrett v. Era Aviation, Inc.*, 996 P.2d 101, 103 (Alaska 2000); *see also VECO, Inc. v. Rosebrock*, 970 P.2d 906, 911 n. 11 (Alaska 1999).

5. *Barrett*, 996 P.2d at 105.

6. See *State v. Coon*, 974 P.2d 386, 398 (Alaska 1999).

7. See *Buoy v. ERA Helicopters, Inc.*, 771 P.2d 439, 442 (Alaska 1989).

8. *Alaska Tae Woong Venture, Inc. v. Westward Seafoods, Inc.*, 963 P.2d 1055, 1062 (Alaska 1998) (quoting *Ben Lomond, Inc. v. Schwartz*, 915 P.2d 632, 635 (Alaska 1996)).

and that Walker had therefore failed to establish a viable cause of action. It repeats this argument on appeal.

■■■■ "The existence of a duty turns not on the particularized facts of a given case, but rather on the basic nature of the relationship between the parties to the cause of action." [9] While the question whether a duty exists may be susceptible to summary judgment, questions about the scope of a duty and whether the duty was breached are normally not susceptible to summary judgment, "particularly so when the scope of the duty poses a fact-specific question, involving policy and 'circumstantial judgments' that our legal system reserves for the jury." [10]

The trial court denied Lynden's motion for summary judgment, basing its conclusion in part on §§ 391, 392 and 393 of the Restatement (Second) of Torts. These sections impose a duty of care on suppliers who supply chattels to others "for the suppliers' business purposes" when the suppliers know or have reason to know that the chattels are likely to be dangerous for intended uses.

Lynden argues that it did not supply chattels (pipe saddles) for its business purposes and so these sections do not apply. Comment d of § 392 of the Restatement addresses the question of what uses are for a "supplier's business purposes." [11] Exactly what is meant by this phrase is not completely clear. But we are told that "the fact that [a chattel] is being used for the purpose of completing a contract or business dealing as undertaken by the supplier is often important." [12] As an example the comment states that a railroad having a contract to deliver

goods may be liable for the unloading of a railcar by its customer's employees at its customer's plant: "This is true because the contract to deliver involves the unloading of the car, and also involves such movements of the car in the private yards of the manufacturing company as are necessary to place it in a position convenient for unloading." [13]

Lynden's contractual responsibility in this case was to load equipment onto a truck owned by H.C. Price, not to deliver materials. Lynden's contractual duties were completed once Lynden loaded the requested equipment. Thus, based on comment d to § 392, it seems doubtful that the pipe saddles met the "supplier's business purposes" requirement at the time Walker was injured.

Although the trial court may have erred in finding a duty based on §§ 391–393 of the Restatement, other jurisdictions have found a duty to load materials so that they can be safely unloaded independent of the Restatement's requirements.[14]

In *Jablonowski v. United States*, a man unloading crates from a boxcar was severely injured when a column of crates fell on top of him.[15] In upholding a jury verdict against the United States, which had loaded the crates, the court permitted recovery on the theory that a consignor has a duty to a consignee to load freight on a railroad car properly.[16]

In *Wintersteen v. National Cooperage and Woodenware Co.*, the Illinois Supreme Court upheld a jury verdict against a shipper when the unloader of the improperly loaded railroad car was injured by barrels falling out of

---

**9.** *P.G. v. State, Dep't of Health and Human Servs.*, 4 P.3d 326, 331 (Alaska 2000) (quoting *M.A. v. United States*, 951 P.2d 851, 854 & n. 6 (Alaska 1998)).

**10.** *Guerrero v. Alaska Housing Finance Corp.*, 6 P.3d 250, 257 (Alaska 2000) (quoting *Arctic Tug & Barge, Inc. v. Raleigh, Schwarz & Powell*, 956 P.2d 1199, 1203 (Alaska 1998)).

**11.** Restatement (Second) of Torts § 392, cmt. d (1965).

**12.** *Id.*

**13.** *Id.*

**14.** See *Jablonowski v. United States*, 230 F.Supp. 740 (E.D.Pa.1964); *Yandell v. National Fireproofing Corp.*, 239 N.C. 1, 79 S.E.2d 223, 226 (1953); *Wintersteen v. National Cooperage & Woodenware Co.*, 361 Ill. 95, 197 N.E. 578 (1935); see also 13 Am.Jur.2d § 320 (1964) (shipper who loads shipment under duty of care to load such that shipment can be safely unloaded); cf. *Elk Corp. of Arkansas v. Jackson*, 291 Ark. 448, 725 S.W.2d 829, 833 (1987) (company loading goods onto tractor trailer has duty to load so that truck can be operated safely).

**15.** 230 F.Supp. 740, 741 (E.D.Pa.1964).

**16.** See *id.* at 742.

the car door.[17] Rejecting the shipper's contention that it had no duty of care to the unloader, the court wrote that "[i]t is axiomatic that every person owes a duty to all persons to exercise ordinary care to guard against any injury which may naturally flow as a reasonably probable and foreseeable consequence of his act . . . ." [18]

As *Wintersteen* indicates, generally an actor, "if he acts at all, must exercise reasonable care to make his acts safe for others." [19] In this sense there is a general duty of care running to all who might foreseeably be injured by an actor's conduct. But duty takes on a special relevance where the question is whether the actor must take affirmative action, or where there are special policy reasons for not imposing tort liability.[20] Here, the defendant acted, so the question is whether this case falls within the latter category; that is, are there reasons of policy for not imposing tort liability on this type of negligent action? As the following review of our case law indicates, such cases are unusual,[21] and this is not one of them.

In *D.S.W. v. Fairbanks North Star Borough School District,* we considered whether a public school had a duty of care to discover and assist in overcoming a child's learning disability.[22] In holding that the school had no such duty, we outlined seven factors a court should consider when determining whether duty attaches to or demands particular conduct.[23] We derived our test from *Peter W. v. San Francisco Unified School District,* in which the California Court of Appeals addressed a similar question, and articulated factors to inform the public policy inquiry into whether a duty should attach.[24] Those factors are:

1. The foreseeability of harm to the plaintiff,

2. The degree of certainty that the plaintiff suffered injury,

3. The closeness of the connection between the defendant's conduct and the injury suffered,

4. The moral blame attached to the defendant's conduct,

5. The policy of preventing future harm,

6. The extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and

7. The availability, cost, and prevalence of insurance for the risk involved.[25]

In finding no duty in *D.S.W.* we stressed the uncertainty inherent in determining educational injury and its cause.[26]

Other cases in which we have found no duty based on a review of the *D.S.W.* factors include:

- *Mesiar v. Heckman.*[27] Here we held that the state did not have a duty to fishermen to collect fish population data in a nonnegligent manner. Despite the foreseeability of economic injury to fisherman if data was improperly collected, we found that the following factors argued against imposing a duty: lack of moral blameworthiness associated with negligent conduct which creates a risk of economic harm, as distinct from a risk of personal injury or death; the possibility that imposing a duty would prompt the state to manage "to heed the loudest threats rather than rely on sound principles of resource management" for the benefit of all Alaskans; and the severe

---

17. 361 Ill. 95, 197 N.E. 578, 582 (1935).

18. *Id.*

19. Restatement (Second) of Torts § 4 (1965).

20. *See* Restatement (Third) of Torts: Liability for Physical Harm (Basic Principles) § 6, cmt. d, and § 7 (Tent. Draft No. 1, March 28, 2001).

21. *See id.* at § 7.

22. 628 P.2d 554, 555 (Alaska 1981).

23. *See id.; see also Schumacher v. City & Borough of Yakutat,* 946 P.2d 1255, 1257 (Alaska 1997).

24. 60 Cal.App.3d 814, 131 Cal.Rptr. 854, 860 (1976).

25. *Id.*

26. *See* 628 P.2d at 556.

27. 964 P.2d 445 (Alaska 1998).

burden a duty would impose on the public, opening "the door to endless damage claims by unlimited groups of resource users."[28]

• *Kooly v. State*[29] and *Schumacher v. City and Borough of Yakutat.*[30] In these cases we addressed the question whether the state and local governments had a duty to make streets and rights-of-way safe for sledding. In determining that no such duty exists, we stressed the burden imposing such a duty would have on the community:[31]

Given the varied terrain in Alaska, it is not possible to make the thousands of miles of state rights-of-way adjacent to highways safe for sledding. Any effort to do so would be both expensive and futile. Imposing such a duty would simply inflict heavy damage judgments on the State with little or no corresponding increase in public safety.[32]

• *Hawks v. State, Department of Public Safety.*[33] This case involved a claim of negligent infliction of emotional distress by a murder victim's mother against the state police for negligent failure to identify the victim's remains. We found that the lack of moral blameworthiness for the police negligence and the burden on the community from permitting such claims weighed heavily against finding a duty.[34]

• *Adkinson v. Rossi Arms Company.*[35] Adkinson was convicted of manslaughter for the intentional killing of a third party. He sued the manufacturer of the gun used in the killing for damages including emotional distress and economic losses, alleging that it was defective and discharged accidentally, causing his conviction and imprisonment. We found that no duty ran from the manufacturer to Adkinson, emphasizing that public policy considerations argued against allowing one convicted of an intentional crime from shifting the consequences of the conviction to a third party and ultimately to the public.[36]

Imposing liability for breach of a duty to load chattels in such manner that they may be safely unloaded has little in common with the foregoing cases. Unlike *D.S.W., Mesiar, Hawks,* and, in part, *Adkinson,* the injury suffered as a consequence of violation of such a duty is personal injury, not emotional distress or economic loss.[37] No plausible "floodgate of litigation" argument can be made. Moreover, recognition of a duty does not conflict with or threaten the implementation of other recognized policies, as was the case in *Mesiar* (sound natural resource management for the general benefit) and *Adkinson* (sound corrections policy).

Instead, analysis of the *D.S.W.* factors weighs in favor of imposing a duty to load materials in a manner so that they can be safely unloaded, and reveals no reason not to conclude that such a duty exists. It is readily foreseeable that if materials are loaded in a way such that they cannot be safely unloaded, people assigned to unload the materials

28. *Id.* at 450–52.

29. 958 P.2d 1106 (Alaska 1998).

30. 946 P.2d 1255 (Alaska 1997).

31. *See Kooly,* 958 P.2d at 1106; *Schumacher,* 946 P.2d at 1257.

32. *Kooly,* 958 P.2d at 1109.

33. 908 P.2d 1013 (Alaska 1995).

34. *See id.* at 1016–17.

35. 659 P.2d 1236 (Alaska 1983).

36. *See id.* at 1238.

37. Section 6, comment (d) of the Restatement (Third) of Torts: Liability for Physical Harm (Basic Principles) (Tent. Draft No. 1, March 28, 2001) draws a pointed distinction between physical harm on the one hand and emotional distress and economic loss on the other:

[J]ust as the general standard of liability stated in this section is limited to physical harm, the general duty of reasonable care is affirmed only in cases involving physical harm. In cases involving negligence that causes emotional distress or economic loss, there is no rule of liability that is as general as this section's physical-harm rule. Accordingly, in such cases courts need to consider whether there is any particular rule of liability that is applicable. In providing this consideration, courts frequently employ the terminology of duty in explaining whether liability is or is not available.

might be injured. Lynden argues that Walker's injury was not foreseeable, and that it was therefore not proper to find it had an actionable duty to Walker. However, the fact-specific foreseeability to which Lynden refers goes to causation and negligence, rather than to the existence of a duty.[38]

There is ample evidence the plaintiff suffered injury, indeed an obvious personal injury. The closeness of the connection between Lynden's conduct and the injury suffered by plaintiff is an issue of some dispute. Lynden argues that there is very little connection between its conduct and plaintiff's injury, pointing out that it had no knowledge or control over where or how Walker attempted to unload the pipe saddles. However, Walker presented evidence at trial showing that loading pipe saddles without pallets was unreasonably dangerous, and that the absence of pallets caused him to attempt to unload the saddles by hand. This is also a fact-specific controversy relevant to the question of negligence and causation. For purposes of the *D.S.W.* inquiry, it is enough to observe that if a product is loaded in a way that it cannot be safely unloaded there generally will be a close connection between the act of loading and injuries suffered while unloading.

As to moral blame, negligence resulting in a risk of personal injury is regarded as significantly blameworthy in ways that negligence resulting only in emotional distress or economic loss is not.[39] The risk in cases of this nature is personal injury.

The policy of preventing future harm is served by imposing on suppliers a duty to exercise reasonable care when loading material to ensure the material may be safely unloaded. Lynden argues that permitting liability in this case would be tantamount to a legal finding of a duty to band pipe saddles to pallets. Lynden mischaracterizes the duty, however. Whether reasonable care required banding the saddles to pallets in Lynden's case was a factual determination that was for the jury to make.[40]

Imposing a duty of reasonable care on Lynden in the circumstances of this case would not unduly burden the community. Our law generally allows those who suffer personal injury caused by the negligent acts of others to shift their losses to the negligent actors. Permitting litigation having a loss-shifting objective in cases of this nature does not threaten to flood the courts with numerous cases of a heretofore unrecognized type. Nor is there the possibility that recognizing a duty to safely load will conflict with the achievement of other important social policies.

Last, there is no evidence in the record regarding the availability of insurance for the risk involved, but it is reasonable to assume that a party like Lynden is able to purchase liability insurance to cover risks like that involved here.

In sum, the *D.S.W.* factors support the trial court's finding that Lynden had a duty of care to load materials in a way that permitted them to be safely unloaded. What the duty of care required under the circumstances, and whether Lynden breached that duty, were questions properly presented to the trial jury.[41]

> 2. *There was a genuine issue of fact whether Lynden had fulfilled its duty to load the pipe saddles so that they could be safely unloaded.*

Lynden argues that it was entitled to summary judgment because there was no factual dispute as to whether the pipe saddles could be safely unloaded. However, one of the central factual disputes in the case was

---

**38.** *See P.G. v. State, Dep't of Health and Human Servs.,* 4 P.3d 326, 332–33 (Alaska 2000) (explaining distinction between foreseeability in determining duty and in establishing causation and negligence).

**39.** *See Mesiar,* 964 P.2d at 451.

**40.** *See Maddox v. River & Sea Marine, Inc.,* 925 P.2d 1033, 1035–36 (Alaska 1996) (stating that, in general, summary judgment is not appropriate

to negligence cases, particularly where there is a factual dispute regarding the extent of a duty).

**41.** *See id.; see also Bolieu v. Sisters of Providence in Wash.,* 953 P.2d 1233, 1241 (Alaska 1998) ("[F]act-intensive inquiries pertain to the issues of breach, causation, and damages, not the threshold legal question of whether a duty exists.").

whether the pipe saddles could be safely unloaded. Some evidence shows the pipe saddles could have been safely unloaded, but there was also contrary evidence, and thus a factual dispute.

Because the trial court correctly found that Lynden had a duty of care, and because there was a factual dispute as to whether the pipe saddles could have been safely unloaded, the trial court's denial of summary judgment is affirmed. For the same reasons, the trial court's denial of JNOV must also be affirmed.

**B.** *The Superior Court Did Not Commit Reversible Error in Its Jury Instructions.*

 1. *Instruction No. 18 was neither an erroneous statement of law nor confusing.*

■ Lynden argues that the trial court erred in submitting Jury Instruction No. 18 [42] to the jury. Lynden's primary argument is that the instruction incorrectly asserts that Lynden had a duty to load the saddles so that they could be safely unloaded. Because Lynden does have such a duty, we reject Lynden's argument.

Lynden's second argument is that the instruction is confusing. Lynden claims that "the instruction obviously invited the jury to assume that Lynden had a duty to load the saddles in a manner that can be unloaded safely *by Walker on the morning in question, with the equipment he had at hand, and in the manner attempted by Walker.*" However, the instruction said only that "a supplier of parts has a legal duty ... to load

materials in a manner that can be unloaded safely." It does not instruct the jury that Lynden had to anticipate who the unloader would be, what equipment might be available, or how the unloading would be accomplished.

In addition, Instruction No. 23 instructed the jury that Lynden had a duty "to exercise reasonable care in loading the material in a manner so that it can be unloaded by a properly equipped and reasonably qualified unloader without creating an unreasonable risk of injury to the unloader." Instruction No. 17 directed the jury to consider whether Walker used reasonable care under the circumstances, requiring the jury to consider the manner in which Walker attempted to unload the pipes. Instruction No. 3 directed the jury to consider all of the instructions together and as a whole. Instruction No. 18, along with Instruction Nos. 3, 17 and 23, considered collectively, correctly described the relevant legal standards.

■ Jury instructions are to be analyzed as a whole, rather than in isolation.[43] In reviewing jury instructions, the relevant inquiry is whether the instructions inform the jury of the applicable law.[44] Because the jury instructions, taken as a whole correctly describe Lynden's duty, we reject Lynden's claim that the submission of Instruction No. 18 to the jury was reversible error.

 2. *Instruction No. 19 had an evidentiary basis, and was not so confusing that it affected the jury's verdict.*

■ Lynden's arguments against the court's submission of Instruction No. 19 [45] to the jury are twofold; the first is that the

---

**42.** Instruction No. 18 provides:

 The law requires that a finding of negligence be based upon the existence of a legal duty on the part of a defendant or party and the unreasonable breach of that duty. In this case you will consider whether there was any negligence on the part of Lynden Logistics, Inc. With respect to the duty of Lynden Logistics, Inc., you are instructed that a supplier of parts has a legal duty, independent of the duty of the driver, to load materials in a manner that they can be unloaded safely. Whether that duty was breached is for you to determine.

**43.** *See Guertin v. State*, 854 P.2d 1130, 1133 (Alaska App.1993).

**44.** *See Cummings v. Sea Lion Corp.*, 924 P.2d 1011, 1019 n. 11 (Alaska 1996).

**45.** Instruction No. 19 provides:

 An act is negligent if the actor realizes, or should realize, that it is likely to affect the conduct of another in such a way as to create an unreasonable risk of harm to another. An unreasonable risk of harm exists when a particular act or type of act involves an unreasonable risk of harm, even when carefully done.

 A person may also act negligently if he creates a situation which is likely to cause another to do a particular act in a particular manner which creates an unreasonable risk of harm, even if the third person's act may be conducted negligently or without adequate preparation.

instruction is circular, the second is that there was no evidence presented to support the instruction. Lynden's criticism of Instruction No. 19 has some merit, because the instruction is circular. The instruction defines an unreasonable risk of harm as existing where an act involves an unreasonable risk of harm. Lynden points out that using a phrase to define itself is not useful. Instruction No. 23 cures the circularity of Instruction No. 19, however, as it instructs the jurors that

> [t]he loader of pipeline construction material has a duty to exercise reasonable care in loading the material in a manner so that it can be unloaded by a properly equipped and reasonably qualified unloader without creating an unreasonable risk of injury to the unloader. A breach of this duty is negligence.

But Lynden does not argue that the circular definition made it impossible for jurors to understand the concept of "unreasonable risk of harm." Instead, Lynden argues that the instruction imposed "another duty on Lynden," arguing that "[t]here is no evidence that Lynden should have foreseen that loading single saddles on the truck would create an unreasonable risk of harm." But as discussed earlier there was evidence that loose pipe saddles created an unreasonable risk of harm, and that Lynden had been warned about this practice. Lynden's argument must therefore fail, because the defect in the instruction caused no harm and because there was an evidentiary basis for the instruction.[46]

C. *The Superior Court Did Not Abuse Its Discretion By Permitting Michael Burleson to Offer Expert Testimony.*

 Admission of expert witness testimony is reviewed for abuse of discretion.[47]

A decision to allow an expert witness to testify will be overturned where the trial court misapprehends the rule regarding the level of skill required to qualify an expert as such.[48] Expert testimony is admissible where it will assist the trier of fact.[49]

Lynden claims that the trial court abused its discretion when it permitted Michael Burleson to testify as an expert for Walker. According to Lynden, Burleson lacked the expertise to help the jury understand the standard of care relevant to this case.

Lynden takes issue with Burleson's testimony that

> [i]t was my opinion that Lynden failed to provide adequate, safe packaging of this material being shipped, the materials being handled and the materials being sent through and but for their failure to provide safe packaging by palletizing this equipment, this accident wouldn't have happened.

Lynden claims that Burleson did not have adequate expertise concerning loading heavy items on trucks in conditions like those prevailing on the North Slope to offer testimony which would provide appreciable help to the jury. The facts Lynden advances in support of its argument range from Burleson's unfamiliarity with North Slope conditions to his failure to perform any experiments specific to this case. All of Lynden's arguments against the applicability of Burleson's experience are relevant, but only as to the weight of his testimony, not to its admissibility.[50]

Burleson testified on the topics of industrial safety and human factors, areas in which he has considerable expertise. Burleson has

**46.** *See id.* (stating that jury instructions will be upheld if the instructions, read as a whole, adequately inform the jury of the relevant law); *see also Nautilus Marine Enters., Inc. v. Valdez Fisheries Dev. Ass'n,* 943 P.2d 1201, 1204 n. 7 (Alaska 1997) (harmless error in jury instructions does not warrant reversal).

**47.** *See State v. Coon,* 974 P.2d 386, 398 (Alaska 1999).

**48.** *See Lewis v. State,* 469 P.2d 689, 695 (Alaska 1970).

**49.** *See* Alaska R. Evid. 702(a); *see also Coon,* 974 P.2d at 393 ("[E]xpert opinion evidence is admissible if the trial court ... determines that ... the trier of fact will be assisted....").

**50.** *See Lewis,* 469 P.2d at 693–94 (holding that reasonable contact and requisite intelligence with the subject is sufficient to admit expert testimony).

a degree in industrial engineering. He is a member of several professional organizations relevant to industrial safety and human factors. He has expertise in the field of industrial safety. Burleson has researched and investigated industrial accidents, including accidents involving forklifts.

██ That Burleson has not been to the North Slope or has not conducted experiments specific to the accident in this case does not disqualify him as an expert, and does not render the trial court's decision to permit his testimony an abuse of discretion. Lynden had an opportunity to cross-examine Burleson at trial, which was the appropriate way for Lynden to challenge the reliability of Burleson's testimony.[51] Moreover, Lynden's own experts had similar deficiencies in their qualifications. We therefore find that the trial court's admission of Burleson's testimony was not an abuse of discretion.

D. *The Award of Future Medical Expenses Lacked a Sufficient Evidentiary Basis.*

██ Lynden asks that the jury's award of future medical expenses be reversed, arguing that "there was precious little evidence of any such expenses, and [that] there was no evidence with which the jury could determine any such expense." Directed verdicts on future medical expenses, as on other subjects, are reviewed to determine whether the evidence, viewed in a light most favorable to the non-moving party, supports the verdict.[52] Although Walker presented enough evidence to prove a reasonable probability of future medical expense,[53] we conclude that he failed to give the jury sufficient information to estimate reasonably the amount of his likely future expenses.

██ A party seeking damages for future medical expenses bears the burden of proving damages.[54] The fact of damages must be proven by a preponderance of the evidence.[55] The amount of damages needs to be proven only to such a degree that the finder of fact can make a reasonable estimate.[56]

Dr. Richard Cobden testified that Walker would need more surgery on the ankle, that he would have pain for the rest of his life, and that he will have future complications from his injury. But Dr. Cobden testified that Walker would only need one additional surgery. Except as to that surgery, Dr. Cobden did not testify that Walker would probably require future medical attention. For example, he testified that there was a fifty percent chance Walker would require antibiotics for the rest of his life. He testified that there was a risk of future arthritis. He testified that Walker's ankle would break more easily than before the injury, but not that it would probably break.

Lynden argues that Walker therefore failed to demonstrate a reasonable probability that he would have future medical expenses, except as to antibiotics and occasional pain medication, and except for the one surgery anticipated by Dr. Cobden. But a jury could have considered all of the possible complications described by Dr. Cobden and decided that Walker would incur significant future medical expenses. Because reasonable persons could differ in their judgments whether Walker will require future medical treatment, we will not overturn the trial court's denial of Lynden's motion for a directed verdict.[57]

██ Lynden asserts that even if Walker had proved that he would incur future medical expenses by a preponderance of the evi-

51. *See id.* at 696.

52. *See Sherbahn v. Kerkove,* 987 P.2d 195, 198 (Alaska 1999).

53. *See Maddocks v. Bennett,* 456 P.2d 453, 457–58 (Alaska 1969) (requiring that medical damages be proved to a reasonable probability); *see also Blumenshine v. Baptiste,* 869 P.2d 470, 473 (Alaska 1994).

54. *See Maddocks,* 456 P.2d at 457–58.

55. *See Pluid v. B.K.,* 948 P.2d 981, 984 (Alaska 1997).

56. *See id.*

57. *See Sherbahn,* 987 P.2d at 198 ("If there is room for diversity of opinion among reasonable people the question is one for the jury.").

dence, he failed to give the jury data upon which to make a reasonable estimate of Walker's future medical costs. The proponent of a damage award for future medical expenses must give the fact finder a means by which to "reasonably estimate" the amount of such damages.[58] In support of its contention, Lynden argues that the only future medical expenses Walker proved to a reasonable probability were antibiotic and pain medication, and monitoring for infection.[59] Lynden then argues that, based on what was reasonably shown, the award of $200,000 was excessive.

In *Sherbahn v. Kerkove,* we upheld a $15,000 award of future damages for medical expenses.[60] In that case, the plaintiff offered expert testimony that he would require trigger-point injection therapy, with a potential cost of $8,000–$15,000.[61] Because a plaintiff need only present "some data ... upon which [the jury] might reasonably estimate the amount" of future medical expenses, we found that the award was supported by the evidence.[62]

By contrast, Walker did not present the jury with evidence, even in the form of estimates, of the costs of the various future medical procedures he would require. Except for $3,376.82 of past expenses for transportation and prescription drugs, Walker provided no data on the cost of his potential future medical costs. He presented the court with a lump sum of $92,757.56 of past medical expenses, but did not break down the lump sum to demonstrate what various procedures or therapies cost. The jury therefore did not have adequate information before it on which it could have based an award of future medical costs, except for

prescription drugs. Even though Dr. Cobden testified that Walker would require at least one more surgery, he did not estimate the cost of that procedure. We therefore vacate the award of future medical expenses and order a remittitur.[63]

## V. CONCLUSION

The superior court did not err in denying Lynden's motion for summary judgment and JNOV because Lynden had a duty to load its materials in a way that permitted them to be safely unloaded, and because there was a material dispute of fact whether Lynden breached its duty. The superior court did not err in permitting Burleson to testify as an expert. The jury instructions were not a misstatement of the law and were not so confusing that they failed to correctly explain the law to the jury. There was evidence supporting the jury's decision that Walker would incur future medical expenses, but there was not sufficient evidence in front of the jury to permit them to calculate damages. We therefore AFFIRM the judgment in all respects, but VACATE the damages award for future medical expenses and order a remittitur on that portion of the damages award.

---

**58.** *See Pluid,* 948 P.2d at 984; *see also City of Fairbanks v. Nesbett,* 432 P.2d 607, 616 (Alaska 1967) (award of damages may not be speculative or conjectural; jury must have reasonable basis upon which to assess damages by a fair degree of certainty).

**59.** In addition to the care described above, Dr. Cobden testified that Walker would need at least one additional surgery. That testimony is sufficient to support a jury's finding that there is a reasonable probability that Walker would undergo at least one surgery.

**60.** 987 P.2d at 199.

**61.** *See id.*

**62.** *Id.* at 199–200 (quoting *Blumenshine,* 869 P.2d at 473).

**63.** The superior court should determine the maximum amount of the award for future medical expenses that the evidence supports concerning prescription drug costs, and require the plaintiff to choose whether to accept a remittitur of that amount or to have a new trial on the issue of future medical damages.