*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| PEGGY DOWNING, | ) | |
| | ) | Supreme Court No. S-18834 |
| Appellant, | ) | |
| | ) | Superior Court No. 3PA-18-01949 CI |
| v. | ) | |
| | ) | O P I N I O N |
| SHORESIDE PETROLEUM, INC. and | ) | |
| RUSSELL MILLS, | ) | No. 7738 – January 17, 2025 |
| | ) | |
| Appellees. | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kari Kristiansen, Judge.

Appearances: William D. Cook, Law Offices of William Dennie Cook, Eagle River, and Griffith J. Winthrop, III, Sheboygan, Wisconsin, for Appellant. Matthew T. Findley and Benjamin J. Farkash, Ashburn & Mason, P.C., Anchorage, for Appellees.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

MAASSEN, Chief Justice.

## I. INTRODUCTION

A motorist was injured when a truck struck the rear of her car while she was stopped at a construction site. The motorist, a physician, sued the driver of the truck and his employer for lost earnings and other damages. After trial the superior court found that the motorist's future earning capacity had been affected but that she

had failed to prove the amount of damages to a reasonable certainty, and it therefore dismissed that damages claim. On appeal we reversed the dismissal, explaining that once the fact of damages for future lost earning capacity was established to a reasonable certainty, a court could reasonably estimate the amount of those damages from the evidence in the record.

On remand, the superior court fashioned a damages award for lost future earning capacity by extrapolating from the earnings the motorist had actually lost during the months immediately following the accident. The motorist appeals, arguing that the superior court erred in its use of the evidence. We see no clear error and therefore affirm the damages award.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

This case is before us for a second time.[1] It arises from a 2017 car accident in which Peggy Downing, a 60-year-old obstetrician-gynecologist (OB/GYN) with her own medical practice, was injured when the car she was driving was rear-ended by a truck driven by an employee of Shoreside Petroleum, Inc.[2] Downing's injuries included bruising, broken ribs, and various neurological symptoms.[3] She sued Shoreside and its employee.[4]

---

[1]    *See Downing v. Shoreside Petroleum, Inc.*, 528 P.3d 874 (Alaska 2023).

[2]    *Id.* at 876.

[3]    *Id.*

[4]    *Id.*

B.    **Proceedings**

1.    **Evidence of future lost income at trial**

At trial Downing presented several expert witnesses who testified about a traumatic brain injury she suffered as a result of the accident.[5]  Some of Downing's experts also testified that the brain injury and other injuries aggravated by the accident limited her ability to work, not least because they caused her to relinquish her hospital privileges at Mat-Su Regional Medical Center, one of the three hospitals where she had performed complex and expensive surgeries.[6]  The superior court generally accepted Downing's evidence, finding that it was more likely than not that she had suffered a loss of earning capacity.[7]

To show the extent of that loss, Downing offered several possible measures of her earning capacity before and after the accident.  The most extensive testimony on the subject came from Enrique Vega, a "rehabilitation counselor and disability management specialist who helps persons with disabilities find and retain employment."  Vega testified that Downing's yearly earning capacity before the accident was most clearly shown by averaging her income from 2015 and 2016, the years immediately preceding the accident, but which also represented a high-water mark for her earnings.  After adjusting to 2020 dollar values and accounting for wage inflation, Vega calculated that Downing could have earned $4,777,010 during the four years between the accident and trial had she not been injured.  Because under his calculations she had actually earned only $951,767 during those four years, Vega testified that Downing had already lost $3,838,935 in earnings.

Turning to future earning capacity, Vega began with the proposition that, although the average remaining work life for a woman Downing's age was 6.3 years at

---

[5]    *Id.* at 877.

[6]    *Id.* at 876-78.

[7]    *Id.* at 883.

the time of the accident, she had been likely to work another 8.5 years so that her business could meet the terms of its lease. According to Vega, the accident had decreased that future working life to 4.1 years. He also calculated that her earning capacity at the time of trial would have been $1,237,888 per year if not for the accident, a number that in his view would have been the same until she retired in the normal course. To estimate Downing's future earnings with her disabilities, Vega offered a range of comparisons: the average fully functional OB/GYN (making $280,000 per year), the average woman with a master's degree and some cognitive disability ($79,000), and the average woman with a doctorate and a cognitive disability (around $90,000). Considering these benchmarks, Vega settled on estimated future yearly earnings of $100,000 as "reasonable." Ultimately, Vega testified that Downing had lost roughly $14 million in past and future earning capacity.

The primary witness for Shoreside on questions relevant to lost earning capacity was Debra Mason, a certified public accountant. Mason compared the amount of money Downing brought into the practice from her own work to the amounts brought in by the practice's other providers, concluding that Downing's net charges showed a disproportionate downturn in only the first quarter after the accident. Mason concluded, therefore, that the only income Downing lost because of the accident occurred from June through September 2017 and amounted to $79,961.

The court awarded Downing $1,036,491 in future medical and life care expenses, $79,961 (Mason's estimate) for past lost income, and $500,000 in noneconomic damages for the severe impairment of Downing's ability to perform a significant part of her professional activities. But the court dismissed Downing's claim for damages for future lost earning capacity. The court found "that while [Downing] has met her burden of proving it is more likely than not that her future ability to earn was decreased after the accident due to her diminished ability to perform complex surgeries and deliveries, she has failed to prove the amount of her loss to a [reasonable degree of] certainty."

## 2. Appeal

Downing appealed, and we held that the dismissal of her future lost earnings claim was error.[8] We explained that while "the *fact* of damages must be proven to a reasonable certainty — that is, the opposing party's fault caused the loss" — the amount of those damages need only be shown by evidence sufficient to enable the fact finder to make a reasonable estimate.[9] Once harm to future earning capacity has been established, a plaintiff only needs to "provide proof allowing 'some reasonable basis upon which a [factfinder] may estimate with a fair degree of certainty the probable loss which plaintiff will sustain.' "[10]

We held that there was enough evidence at trial on which to estimate this item of damages.[11] Thus, once the superior court had found that Downing suffered some loss of future earning capacity, it was obliged to award damages based on its best estimate of that loss.[12] We remanded to the superior court for this narrow purpose.[13]

## 3. Remand

The superior court on remand first asked the parties whether more evidence was needed to comply with our remand order. Both parties said no. The court's subsequent order on Downing's loss of earning capacity was therefore based on the evidence already in the record.

The court first related the facts relevant to Downing's pre- and post-accident earning capacity. The court described her as "a highly intelligent, energetic,

---

[8] *Id.* at 884-90.

[9] *Id.* at 886 (emphasis added).

[10] *Id.* at 887 (quoting *City of Fairbanks v. Nesbett*, 432 P.2d 607, 616 (Alaska 1967)).

[11] *Id.* at 888-89.

[12] *Id.* at 889-90.

[13] *Id.* at 890.

and successful individual prior to her accident" who had done well in her medical studies and "built a highly successful medical practice" of which she was the sole owner, employing "a number of individuals." She had surgical privileges at three area hospitals and in the year before the accident generated $1,169,554 in revenue for her business from her own provision of medical services. "After the accident, [however, she] took longer to process information," was more likely to become fatigued, irritated, or frustrated, "lacked confidence in making business decisions, was not as independent as before, relied on others for help to complete tasks, and would become overwhelmed by her grandchildren."

From the accident date, June 5, 2017, to late June, Downing did not work; she spent the time recovering from the accident and taking a previously planned vacation. But "[b]y late June" she had returned to work, and she began performing surgeries again in July. In August she provided Mat-Su Regional with a doctor's letter explaining her injury and "evaluat[ing] her ability to perform surgery"; apparently as a result she "agreed to give up her surgical privileges" at that hospital. But she retained her surgical privileges at the other two hospitals, and "by September [she] had returned to [a] full on-call and surgical schedule," including performing "some outpatient surgeries" at a surgery center.

After the superior court related this background, it reviewed the expert testimony it had received on the subject at the first trial. Quoting from our *Downing* decision, it then articulated the task before it on remand: to determine "the difference between earning capacity before and after the injury."[14] The court observed that there was no fixed rule on how to estimate this loss, but that Alaska's jury instructions allow a factfinder to consider "the plaintiff's health, physical and mental abilities, her work

---

[14] *Id.* at 888 (original emphasis omitted by superior court).

habits and occupation before the accident, the nature and extent of her injuries; and how long and to what extent her injuries will affect her earning ability."[15]

The court then reevaluated the expert testimony it had heard at trial. It again concluded that it did not find persuasive Vega's testimony about Downing's pre-accident earning capacity, based on the average income of her business for its "two highest grossing years," averaged "as if those years are reflective of the business's overall profits." The court rejected this methodology for two reasons: first, because it failed to account for fluctuations in business income due to factors like demographic changes and increased competition from other health care providers, and second, because it failed "to separate the business from the person" by attributing all business revenue to Downing's own efforts. The court instead used defense expert Mason's estimate of Downing's pre-accident earnings based on "her net provider charges," which the court believed was "the best evidence of her earning capacity at the time" given her age and remaining work life. This number was $1,169,554.

The court next looked at Downing's post-accident earning capacity. For this step in the calculation the court did "not find either expert['s] numbers to be persuasive." It described Vega's number of $100,000 a year as "based upon the average income of OB/GYNs in Alaska, at $250,000 a year, and the average income of females with a doctorate degree and cognitive disabilities, at $90,000 a year." It found Vega's number "conjectural at best," as it failed to address (1) any dissimilarities between Downing, pre-accident, and other OB/GYNs; (2) the many variables that could affect the earnings of women with cognitive disabilities; (3) Downing's actual post-accident earnings; and (4) whether Downing would actually retire at the average retirement age. The court also rejected the defense's estimate of lost earning capacity — zero — which Mason based on her conclusion that Downing had returned to her pre-accident capacity.

---

[15] *See* Alaska Pattern Jury Instructions – Civ. 20.04.

The court reasoned that Mason's estimate "failed to consider the extent that [Downing's] injuries affected her work ability, to some degree," including her loss of surgical privileges at one of the hospitals. The court determined that Downing's "post-injury earning capacity" was "approximately $1,018,087.40."

To reach this number the court first looked at Downing's pre-injury earnings, which it had found to be $1,169,554 based on Mason's testimony, "and reduced that by [Downing's] expected loss of income." To quantify Downing's expected loss of income, the court first determined her "daily loss of income," which it calculated to be $79,961 divided by 122 days — that is, the total amount lost divided by the number of days between the accident and "her return to pre-accident net charges in October [2017]." This number was $655.42, which the court then multiplied by 230[16] "to arrive at an annual expected loss of income of $150,746.60." The court reasoned that this number took into consideration the facts that Downing "still retain[ed] some capacity to run her business, still retain[ed] other doctors in the business who likely ha[d] surgical privileges, and still retain[ed] some surgical privileges [herself] — minus her surgical privileges at [Mat-Su Regional]." It also took into consideration the fact that Downing "was likely reaching the top end of her earning capacity at the time of the incident, given that she was 63 and close to retirement."

The superior court's next task was to determine how many years Downing would suffer this annual expected loss of income, i.e., "when [her] career was likely to end." The court found unpersuasive Vega's testimony that Downing would work for another 8.5 years — through the end of her business's current lease — given her testimony that she had already been in talks to sell the business to other providers. The

---

[16]   The court reduced the number of work days from 260, which is the approximate number of work days in a year, to 230 to reflect the fact that its daily earning loss figure would otherwise be inflated by the days Downing took off entirely during 2017 to recover from her injuries — a loss of time that would not be repeated in future years.

court found "the more persuasive number to be the average age that women retire, which [would be another] 6.3 years." Multiplying the number of years by the annual expected loss of income yielded a damage figure for "loss of earning capacity totaling $949,703.58." When added to Downing's other damages, the total award was $2,566,155.58.

Downing appeals that award.

## III.   STANDARD OF REVIEW

Lost earning capacity damage awards occupy a middle ground between factual findings and discretionary choices. Generally, a damages determination is a finding of fact we review for clear error.[17] When damages cannot be precisely determined, as is the case here, trial courts may be forced to estimate the correct value and will be given some latitude in doing so.[18] Accordingly, a court's estimation of lost earning capacity will not be disturbed on appeal if it "appears reasonable and is grounded upon the evidence."[19] Because weighing conflicting evidence is a "function of the trial court, not of this court," we will not find clear error in the superior court's reliance on one expert's testimony over another's as long as the record contains sufficient support for the court's decision.[20]

## IV.   DISCUSSION

Downing makes two related claims on appeal: first, that the superior court erred by failing to find that her post-accident earning capacity was somewhere within the range of figures proposed by her witnesses; and second, that the court overestimated her post-accident earning capacity.

---

[17]   *Burton v. Fountainhead Dev., Inc.*, 393 P.3d 387, 392-93 (Alaska 2017).

[18]   *Id.* at 393.

[19]   *Morrison v. State*, 516 P.2d 402, 405 (Alaska 1973).

[20]   *Morris v. Morris*, 506 P.3d 8, 13 (Alaska 2022) (quoting *Burton*, 393 P.3d at 392).

**A.** **The Superior Court Was Not Required To Choose One Of Downing's Estimates Of Post-Accident Earning Capacity.**

Downing contends that the superior court erred by finding that she retained a post-accident earning capacity of $1,018,047 per year, a number the court extrapolated from its own review of the record. Downing contends that the only estimates of post-accident earning capacity in evidence were those offered by Vega, Downing's colleague Dr. Donna Chester, and Downing herself; that these numbers were unrebutted; and that they therefore represented the "outer margins from which a residual earning capacity figure may be selected" — meaning that the only acceptable post-accident earning capacity estimates were between $90,000 and $200,000 per year. But Downing's assertion that these figures were uncontroverted at trial is mistaken, and even if they had been uncontroverted the court would not have been required to accept them.

While Shoreside did not offer a specific number for post-accident earning capacity, its expert Mason testified that Downing experienced no loss of earnings after 2017 as a result of the accident. Thus, although the court rejected Mason's opinion that Downing had suffered no loss of future earning capacity, it heard testimony that could have led it to conclude that Downing's post-accident earning capacity was anywhere from $90,000 (Vega's lowest estimate) to $1,169,554 (Mason's estimate of Downing's pre-accident earning potential, unchanged by the accident).

Even without Mason's testimony, the court's consideration of Downing's post-accident earning capacity would not have been bounded by the testimony of her experts. Downing supports her contrary argument by citing a number of cases from other jurisdictions, most of which upheld damage awards within the range of expert opinions offered at trial. But we read these cases as holding nothing more than that, in their particular circumstances, a trier of fact could reach an affirmable damages award

-10- 7738

by rejecting both sides' experts and settling on a mid-range figure instead.[21]  None of the cases establishes a rule that would force a fact finder to choose a damage award within a range of proposed values that the fact finder considers unreliable.  On the contrary, a fact finder is "free to accept or reject the experts' reports" and can come to its "own conclusion regarding lost earning capacity."[22]  This is true even when experts are uncontradicted:  "Even in those instances where several competent experts concur in their opinion and no opposing expert evidence is offered, the jury [is] still bound to decide the issue upon [its] own fair judgment, assisted by the statements of the experts."[23]  As long as the damages award has a "reasonable basis," it does not need to correlate precisely with any witness's opinion.[24]

---

[21]     *See Liberty Mut. Ins. Co. v. Indus. Accident Comm'n*, 199 P.2d 302, 306-07 (Cal. 1948) (emphasizing jury's role in determining relative weight to give both expert and lay testimony, and noting narrow exceptions — such as standard of care in medical malpractice cases — in which jury's finding must be supported by expert testimony).  Other cases Downing cites involve the valuation of property, where the law may require specific valuation methods and the record may be devoid of evidence other than expert opinions.  *See, e.g.*, *San Diego Metro. Transit Dev. Bd. v. Cushman*, 62 Cal. Rptr. 2d 121, 128 (Cal. App. 1997) (affirming award of damages in eminent domain action involving competing estimates of property's value); *F.L. Walz, Inc. v. Hobart Corp.*, 586 N.E.2d 1314, 1319 (Ill. App. 1992) (affirming award of damages for loss of business franchise involving competing estimates of business's value); *Drainage Dist. No. 10 of Kearney Cnty. v. Canaday*, 199 N.W.2d 385, 387 (Neb. 1972) (affirming apportionment of drainage project's benefits when evidence conflicted as to whether landowners were benefited at all).

[22]     *Michel v. Total Transp., Inc.*, 957 F.2d 186, 192 (5th Cir. 1992).

[23]     *Richey & Gilbert Co. v. Nw. Nat. Gas Corp.*, 134 P.2d 444, 453 (Wash. 1943); *see also* 31A AM. JUR. 2D *Expert and Opinion Evidence* § 89 (2024) ("The opinions of expert witnesses, even where unambiguous and uncontradicted, thus are not necessarily conclusive, and may be disregarded or rejected by the trier of fact, unless the subject matter is one for expert witnesses alone." (internal citations omitted)).

[24]     *See Downing v. Shoreside Petroleum, Inc.*, 528 P.3d 874, 886-87 (Alaska 2023).

Because the court was free to disregard Downing's witnesses if it found them unpersuasive, it did not have to make an award based on a post-accident earning capacity in a range those witnesses suggested. The court did not err by estimating Downing's post-accident earning capacity based on its own view of the evidence.

**B.    The Superior Court Did Not Clearly Err In Its Estimate Of Post-Accident Earning Capacity.**

Because the court did not find Vega's testimony credible, it chose instead to rely on Downing's actual earnings before the accident and the earnings she lost between the accident and the trial in order to fashion its lost future earning capacity award. This evidence does not directly describe future earning capacity, but the court did not clearly err by using it to formulate an award.

**1.    The court could reasonably extrapolate Downing's lost earning capacity from Mason's testimony about her lost earnings.**

Mason's method for calculating lost earnings between the accident and trial was premised on a comparison of Downing's provider charges to the charges of other providers in her practice, who were theoretically unaffected by Downing's accident. Mason looked at the period from 2014 through the end of 2019 and found that Downing's charges diverged from those of the other providers only in the months immediately following the accident, leading Mason to conclude that Downing's loss of earnings from the accident ended by October 2017. The total loss from June through September, as Mason calculated it, was $79,961.

The court divided that figure by 122 — the "approximate number of days between the plaintiff's accident and her return to fulltime employment"[25] — to reach a daily earning loss number. By multiplying this number by the number of working days

---

[25]    The source of this number is not obvious, but it is consistent with what Mason described as a return to full earning capacity by late 2017. The length of time from June 1 to October 1 is 122 days.

in Downing's anticipated post-accident work life, the court arrived at its total lost earning capacity award.

This method was certainly imperfect. A snapshot of Downing's charges during that 122-day period both *under*estimated her future earning capacity — by failing to capture the extent of her recovery — and *over*estimated her future earning capacity by failing to include later setbacks, such as the loss of her Mat-Su Regional surgical privileges.

Nonetheless, because estimates of future lost earning capacity are necessarily imprecise, we cannot say that the superior court made an obvious mistake when crafting its award. The period from June to October 2017 was a time when Downing was advised not to work full time, and for most of which, according to her testimony, she was doing "[z]ero to five percent of [her] premorbid professional activities." Other evidence indicated that this was a period of lower earning activity for Downing. Although the drop in Downing's earnings during those months is not a direct measurement of her lost future earning capacity, it does reflect her reduced level of activity. We agree with the superior court's conclusion that the award will fairly compensate Downing for her inability to perform at her pre-accident level.

**2.    The superior court's implied finding on Downing's expected future work life was not clearly erroneous.**

Downing also contends that the superior court erred by failing to consider the extent to which the accident shorted her expected work life. Her expert Vega testified that her expected work life had been reduced from 8.5 years — the time remaining on her business's lease — to 4.1 years. Downing contends that this testimony

"went unrebutted"[26] and, when properly applied to the superior court's damages figures for lost earning capacity, results in a much higher award.

As noted above, however, just because one side at trial does not challenge a particular aspect of an opposing expert's testimony does not mean that the court has to accept it as fact.[27]  Downing had the burden of proving that her work life had been shortened by the accident,[28] and her only evidence of that was Vega's testimony, which the court, for various reasons, declined to credit.

Alaska Civil Rule 52 requires that courts in non-jury trials "find the facts specially and state separately [their] conclusions of law thereon."[29]  For Downing's work life expectancy before the accident, the court very clearly used 6.3 years, the statistical average for women her age; the court found unconvincing Vega's testimony that she would work longer, through the end of her lease.  For Downing's *post*-accident work life expectancy, however, we agree that the superior court did not explicitly state its finding.  But implicit in its discussion of the full award is a supportable finding that Downing's remaining work life after the accident was still 6.3 years, i.e., that she would likely retire at the same time she would have if the accident had not occurred.

That this was the court's finding of remaining work life is clear from its use of 6.3 years in calculating Downing's actual loss:  6.3 years of work life times $150,746.60 annual loss of income.  As record support the court referenced Downing's

---

**26**    Downing also asserts that we "twice acknowledged in *Downing I*" the alleged fact that her work life had been shortened to 4.1 years, citing *Downing*, 528 P.3d at 880, 884 n.8.  We acknowledged Vega's testimony to that effect; we did not purport to accept a 4.1-year remaining work life as established fact.

**27**    *Richey & Gilbert Co.*, 134 P.2d at 453.

**28**    *Conam Alaska v. Bell Lavalin, Inc.*, 842 P.2d 148, 154 (Alaska 1992) ("The party seeking damages bears the burden of proof of such damages."); *see also Lynden, Inc. v. Walker*, 30 P.3d 609, 619 (Alaska 2001) ("A party seeking damages for future medical expenses bears the burden of proving damages.").

**29**    Alaska R. Civ. P. 52(a).

trial testimony about so-far unsuccessful attempts to sell her practice and become an employee of the new owner; this shows that the court understood the relevance of Downing's post-accident work life. But given that there was no other evidence that Downing was likely to shorten her professional career as a result of the accident, and given that the burden to show otherwise was on Downing herself, the court did not clearly err by finding that she remained likely to retire at the average retirement age for women.

## V.    CONCLUSION

The superior court's order on remand on Downing's loss of earning capacity is AFFIRMED.